Argued and submitted June 10, 2009, decision of Court of Appeals affirmed in part and reversed in part; judgment of circuit court reversed, and case remanded to circuit court for further proceedings July 1, 2010

## STATE OF OREGON,
*Petitioner on Review,*

*v.*

## HYATT ROBIN VONDEHN,
*Respondent on Review.*

(CC C040956CR; CA A128800; SC S056371)

236 P3d 691

Erin C. Lagesen, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. With her on the brief were John R. Kroger, Attorney General, and Erika L. Hadlock, Acting Solicitor General.

David J. Celuch, Portland, argued the cause and filed the brief for respondent on review.

WALTERS, J.

Linder, J., filed a concurring opinion in which Balmer and Kistler, JJ., joined.

## WALTERS, J.

This criminal case raises two questions of first impression regarding the right against compelled self-incrimination in Article I, section 12, of the Oregon Constitution[1] and the consequences of the failure to give *Miranda* warnings to a person who is in custody and subjected to custodial interrogation.

The uncontested facts establish that the police arrested defendant on a warrant, handcuffed him, and placed him in the back seat of a patrol car. A police officer then asked defendant two questions about a backpack that the officer had found in the car in which defendant had been a passenger. In response, defendant admitted that he owned the backpack and that it contained marijuana. The trial court suppressed those answers because the police had failed to administer the required *Miranda* warnings. The trial court did not, however, suppress the marijuana, ruling that defendant's answer to the next question that the officer asked—whether they could search the backpack—was voluntary. Relying on defendant's consent, the officer searched the backpack, discovered marijuana, gave the required *Miranda* warnings, and questioned defendant further. The officer asked defendant where he got the marijuana, how much marijuana there was, how much defendant had paid for it, and whether he was a middleman. Defendant responded to each of those questions, but, after he admitted that he was a middleman, defendant declined to provide further information and asked for an attorney. The trial court ruled that defendant's responses to the post-*Miranda* questions also were voluntary and that they would be admitted.

In a stipulated facts trial, the court found defendant guilty of the crimes of delivery and possession of a controlled substance.[2] Defendant appealed and claimed as error the denial of his pretrial motions to suppress the marijuana and his post-*Miranda* statements.

---

[1] Article I, section 12, provides, in part, that "no person shall * * * be compelled in any criminal prosecution to testify against himself."

[2] Defendant was convicted under *former* ORS 475.992 (2003), *renumbered as* ORS 475.840 (2005).

The Court of Appeals observed that *Miranda* warnings are an essential part of the rights granted by Article I, section 12, and that the exploitation analysis articulated by this court in *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), provided the appropriate framework to analyze the consequences of failing to give those warnings. *State v. Vondehn*, 219 Or App 492, 501-07,184 P3d 567 (2008). In applying the *Hall* analysis, the court concluded that, because the police had obtained both the marijuana and the post-*Miranda* statements by exploiting defendant's pre-*Miranda* statements, they must be suppressed. *Id.* at 507-10.

More specifically, the court reasoned that the police had learned that the backpack belonged to defendant only through their pre-*Miranda* questioning and that "[d]efendant's answers to [the officer's] questions gave [the officer] the information that he needed to ask defendant for consent to search it." *Id.* at 508. Therefore, the Court of Appeals identified a "but-for relationship between the unconstitutional questioning and defendant's consent to the search." *Id.* The court then decided that the state had not demonstrated that the evidence did not derive from the preceding illegality. The state had not argued to the trial court that the police inevitably would have discovered the evidence in the absence of the *Miranda* violation, and the police had not obtained the evidence independently of the *Miranda* violation. The violation provided the basis for the consent to search, and the consent led to the evidence. Moreover, there were no intervening circumstances that broke the causal chain between the *Miranda* violation and defendant's consent. Because the Court of Appeals concluded that the police had obtained the marijuana by exploiting the *Miranda* violation, it held that the trial court had erred in denying defendant's motion to suppress. *Id.*

As to the post-*Miranda* statements, the Court of Appeals reasoned that, "but for" the illegal questioning and search of the backpack, the officer would not have had the information on which he based his post-*Miranda* questions. *Id.* at 509-10. The record did not demonstrate that the police inevitably would have obtained the later statements, nor did the record demonstrate that the police had obtained them

independently from the earlier violations. *Id.* at 510. The Court of Appeals concluded that the trial court had erred in admitting both the marijuana and the post-*Miranda* statements and reversed defendant's convictions. *Id.* at 509-10.

On review, the state acknowledges that this court has held that, when a person is in custody, the police must inform the person of his or her *Miranda* rights before subjecting the person to custodial interrogation, and the failure to give the required warnings necessitates the exclusion of all statements that the person makes in response to the interrogation. Applying that warning requirement and exclusionary rule to the facts of this case, the state also acknowledges that defendant was in custody and subjected to custodial interrogation when the police asked him whether he was the owner of the backpack and whether the backpack contained marijuana.[3] Thus, the state concedes, the trial court properly excluded from evidence defendant's responses to that interrogation—that he owned the backpack and that it contained marijuana.

The state contests, however, the conclusion of the Court of Appeals that the marijuana and the statements that defendant made after the police administered *Miranda* warnings must also be excluded. With respect to the marijuana, the state first contends that, although the text of Article I, section 12, precludes the admission of coerced testimony, it does not extend similar protection to uncompelled physical evidence. Alternatively, the state contends that the rule that requires the exclusion of statements made without the benefit of *Miranda* warnings is a prophylactic rule that reaches beyond the requirements of the constitution itself and that that rule should not be extended to preclude admission of physical evidence. The "mere failure," as the state puts it, to give *Miranda* warnings does not constitute a constitutional violation and therefore call for a *Hall* exploitation analysis. With respect to the post-*Miranda* statements, the

---

[3] As a result of the state's acknowledgement, we do not consider whether the two questions that the police asked in this case constituted "interrogation." *See State v. Scott*, 343 Or 195, 203, 166 P3d 528 (2007) (defining "interrogation" as "conduct that the police should know [is] reasonably likely to elicit an incriminating response"). When we refer to "custodial interrogation" elsewhere in this opinion, we mean interrogation that meets the *Scott* definition.

state contends that the sole test of their admissibility should be whether they were made voluntarily, an issue that the Court of Appeals did not reach.

■■ This case, as framed by the state's arguments, requires that we address the effect of the failure to give *Miranda* warnings in two distinct circumstances: (1) when the police commence custodial interrogation without giving required *Miranda* warnings and thereafter obtain incriminating physical evidence; and (2) when, after conducting an initial, unwarned custodial interrogation, the police give the required warnings and the defendant makes further incriminating statements. As to the first circumstance, we hold that when the police conduct custodial interrogation without obtaining a valid waiver of Article I, section 12, rights, they violate Article I, section 12, and the derivative physical evidence that they obtain must be suppressed. As to the second circumstance, we hold that a trial court must exclude defendant's warned post-*Miranda* statements unless the state establishes that, considering the totality of the circumstances, when the police belatedly administer *Miranda* warnings, they effectively and accurately informed the defendant of his or her Article I, section 12, rights. We affirm the decision of the Court of Appeals in part, reverse it in part, and remand this case to the trial court for further proceedings.

## I. INTERROGATION WITHOUT *MIRANDA* WARNINGS

The state begins its argument about the admissibility of physical evidence obtained without the benefit of *Miranda* warnings with the text of Article I, section 12: "[N]o person shall * * * be compelled in any criminal prosecution to testify against himself." The state argues that that text does not prohibit the admission of physical evidence, even physical evidence that is a "fruit" of a defendant's compelled testimony; it prohibits only compelling a person to "testify." The state also contends that the text of Article I, section 12, does not prohibit the state from using a person's compelled statements to investigate a crime and obtain evidence of the crime; it only creates a right not to have the statements themselves introduced "in any * * * criminal proceeding." In support of those arguments, the state directs us to the comparatively broader wording of other state constitutions and

to cases discussing the common-law privilege against self-incrimination as it was recognized at the time that Article I, section 12, was adopted.

This court first considered the text of Article I, section 12, and its history in *State v. Cram*, 176 Or 577, 160 P2d 283 (1945). The issue in that case was whether the testimony of a physician as to the alcohol content of a sample of the defendant's blood, taken from him while under arrest and in custody, violated the defendant's rights under Article I, section 12.[4] *Id.* at 578-79. The court noted that, with two exceptions, all state constitutions contain provisions against "self-crimination." *Id.* at 579. The wording of those provisions varies from prohibitions on "testifying" and "furnishing evidence" to "being a witness," but the court observed that the difference in phrasing had not been considered important in construing their meaning. *Id.* at 579-80. The court also noted that the constitutional privilege against self-incrimination had generally been held to be declaratory of the common-law privilege and that that privilege was not limited to testimonial utterances, but extended to prevent the compelled production of documents or chattels. *Id.* at 581-82 (quoting 8 Wigmore on Evidence § 2263). The court also quoted Wigmore for the proposition that, when physical evidence is obtained by means other than compulsion of the defendant, it is admissible as long as admission does not depend on the defendant being called upon to make "any act or utterance of his own." *Id.* at 582. Finally, the court applied those principles to conclude that the testimony of the physician about the blood sample did not violate the defendant's Article I, section 12, rights. *Id.* at 593. The defendant had not been compelled to establish the authenticity, identity, or origin of the blood; those facts were proved by other witnesses. *Id.*

In *State v. Soriano*, 68 Or App 642, 646, 684 P2d 1220 (1984), *aff'd and opinion adopted*, 298 Or 392, 693 P2d

---

[4] The defendant had not contested the act of obtaining the blood as an unconstitutional search or seizure. This case does not present that issue or the issue discussed by the dissent in *State v. Fish*, 321 Or 48, 64-71, 893 P2d 1023 (1995) (Gillette, J., concurring in part and dissenting in part)—whether physical evidence concerning a person's identity, appearance, or physical condition implicates Article I, section 12.

26 (1984), this court again examined the history of the constitutional right against self-incrimination and again concluded that the differences in various state constitutional provisions were inconsequential: "The constitutional language varies, but courts generally treat the basic principle as the same in all the states." 68 Or App at 646. The *Soriano* court also agreed that the word "testify" is not a limit on the protections that Article I, section 12, affords: "We see no reason to construe the Oregon Constitution to give protection from testifying but not from furnishing evidence." *Id.* at 646-47 n 4.

In *Soriano*, this court held that the Oregon Constitution prohibits the state from requiring a witness to relinquish the Article I, section 12, right against self-incrimination unless it provides the witness with an alternative that affords the same protection as the constitution. *Id.* at 662. The issue in *Soriano* was whether Article I, section 12, permits the state to compel the testimony of a witness in exchange for "use" or "derivative use" immunity without also extending "transactional immunity." *Id.* at 644. Use and derivative use immunity preclude the state from using compelled statements of a witness and their direct or indirect fruits, such as physical evidence discovered as a result of the statements, in a prosecution of that witness. *Id.* at 644 n 3. Transactional immunity precludes the state from prosecuting the witness for any offense to which the statements relate. *Id.* The court acknowledged that, when a witness provides compelled statements, those statements may influence a prosecution even if they are not offered in evidence or used to obtain derivative evidence. *Id.* at 663. For example, the statements may affect the discretionary decisions of a prosecutor to bring charges or to accept a plea bargain. *Id.* The court held that the state could not compel the statements of a witness without granting transactional immunity because, without protecting the witness from all evidentiary and nonevidentiary use of compelled statements, the state would not afford the witness the same protection that the constitution confers—the right to remain silent. *Id.* at 662.

Thus, this court has long interpreted Article I, section 12, to impose no distinction between compelled statements and physical evidence derived from such statements or

between the use of compelled statements to obtain evidence and as testimony at trial. We reject the state's argument that we should now impose those limitations on the reach of Article I, section 12. We turn to the state's alternative argument that, even if Article I, section 12, requires that physical evidence derived from compelled statements be excluded from evidence, the same is not true for physical evidence derived from the "mere failure to provide *Miranda* warnings."

For an understanding of that argument, the state directs us to the reasoning of the plurality in *United States v. Patane*, 542 US 630, 124 S Ct 2620, 159 L Ed 2d 667 (2004). Although the state acknowledges that we need not defer to the United States Supreme Court when we interpret the state constitutional right found in Article I, section 12, *see Soriano*, 68 Or App at 645-46 (giving reasons for independent interpretation of state constitutional right against self-incrimination),[5] the state finds the logic of the lead opinion in *Patane* persuasive, and we would be remiss if we did not consider it. That is particularly so because it was the Supreme Court that first required, to effectuate the protections afforded by the Fifth Amendment to the United States Constitution, the warnings that this court later required to effectuate the protections afforded by Article I, section 12, known to both courts by the name of the Supreme Court's decision, *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966).

In *Patane*, the police arrested a defendant for violating a restraining order. A detective attempted to inform the defendant of his *Miranda* rights, but the defendant interrupted and asserted that he knew his rights, and the officers did not attempt to complete the warning. The detective then asked the defendant about a gun. The defendant said that he did not want to discuss it because he did not want the detective to take the gun away from him. The detective persisted.

---

[5] In *Soriano*, the court noted that the common-law rule that no person is bound to accuse himself first received constitutional status in Virginia in 1776 and that it was not added to the United States Constitution until 1791. 68 Or App at 646. The court explained that "[w]hen the United States Supreme Court first acted it simply adopted one line of state decisions and rejected another." *Id.*

The defendant told him that the gun was in a particular bedroom and gave the detective permission to retrieve the gun.

The government conceded that the defendant's answers to the detective's questions were inadmissible under *Miranda*, but argued that the failure to complete the *Miranda* warning did not require suppression of the gun itself. The plurality, consisting of Justice Thomas, Chief Justice Rehnquist, and Justice Scalia, took the position that, although the admission of "actually coerced statements" and physical evidence derived from such statements violates the Fifth Amendment, "a mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights * * *."[6] 542 US at 641-44. Thus, the plurality reasoned, there was no violation of the Fifth Amendment to deter and no reason to apply the "fruit of the poisonous tree" doctrine of *Wong Sun v. United States*, 371 US 471, 83 S Ct 407, 9 L Ed 2d 441 (1963). *Patane*, 542 US at 641-42. According to the plurality, the *Miranda* rule is a prophylactic rule that sweeps beyond the actual protections of the Self-Incrimination Clause. *Id.* at 639. A court must presume that statements made without its protections are compelled, but there is no need extend that rule to exclude physical evidence obtained as a result of unwarned statements. *Id.* at 639-43.

Justices Kennedy and O'Connor concurred in the result. They reasoned that *Miranda* was based in large part on an effort to accommodate concerns about compelled testimony and other objectives of the criminal justice system. Given the important probative value of reliable physical evidence, they could not justify exclusion based on "a deterrence

---

[6] The plurality acknowledged that the Court had held in *Dickerson v. United States*, 530 US 428, 444, 120 S Ct 2336, 147 L Ed 2d 405 (2000), that *Miranda* announced a constitutional rule that could not be altered by Congress, *Patane*, 542 US at 636, but cited *Chavez v. Martinez*, 538 US 760, 772-89, 123 S Ct 1994, 155 L Ed 2d 984 (2003) (plurality opinion) for the proposition that a failure to give those constitutionally required warnings does not violate the constitution. *Patane*, 542 US at 641. One of the problems with the plurality's approach is that *Chavez* was a case brought under 42 USC section 1983. The plaintiff in that case had not been criminally prosecuted and, therefore, no evidence, direct or derivative, had ever been used against him. However, we need not pick and choose here: a plurality opinion, particularly a plurality opinion addressing a federal constitutional issue that is not before us, is not controlling, and it therefore stands only for whatever persuasive power its logic carries.

rationale sensitive to both law enforcement interests and a suspect's rights during an in-custody interrogation." *Id.* at 644-45.

To address the state's argument that, in interpreting Article I, section 12, we should adopt the reasoning of the plurality opinion in *Patane*, we must examine the nature and purpose of the *Miranda* warnings that this court requires and the reasons that statements made without the benefit of those warnings are excluded from evidence.

In *State v. Magee*, 304 Or 261, 266, 744 P2d 250 (1987), this court stated that Article I, section 12, "furnishes an independent basis" for requiring that police administer *Miranda* warnings to suspects who are in custody. The prior year, in *State v. Smith*, 301 Or 681, 725 P2d 894 (1986), the court had discussed the basis for the United States Supreme Court's *Miranda* decision and whether similar warnings were required by the Oregon Constitution. *Smith* was a divided opinion that resulted in the affirmance of defendant's conviction on the basis that the defendant was not in custody when he made the unwarned statements. When the court then decided *Magee*, it did not reprise the arguments that it had considered in *Smith* or state the rationale for its historic decision.

■ Since *Magee*, this court consistently has held that the Oregon Constitution requires suppression of statements made without the benefit of *Miranda* warnings. *See, e.g.*, *State v. Roble-Baker*, 340 Or 631, 643-44, 136 P2d 22 (2006) (suppressing unwarned statements made during custodial interrogation); *State v. Smith*, 310 Or 1, 7, 791 P3d 836 (1990) (so stating). The full extent of the court's discussion of the rationale for that rule has been to state that, when a suspect is subjected to custodial interrogation, warnings are necessary " 'because of the inherent level of coercion that exists in such interrogations.' " *State v. Scott*, 343 Or 195, 200, 166 P3d 528 (2007) (quoting *State v. Joslin*, 332 Or 373, 380, 29 P3d 1112 (2001)); *see also State v. Meade*, 327 Or 335, 339, 963 P2d 656 (1998). Further, in discussing the requirement that police advise suspects subjected to custodial interrogation of the right to assistance of counsel, the court has stated that that particular warning is required because "a lawyer's

presence at a custodial interrogation is one way to ensure the right to be free from compelled self-incrimination." *Meade*, 327 Or at 339. A suspect must be informed if an identified lawyer has been retained or appointed and is seeking to consult with the suspect. Without that information, the suspect cannot "be said knowingly to have waived his or her right against compelled self-incrimination under Article I, section 12." *Joslin*, 332 Or at 383 (citing *State v. Haynes*, 288 Or 59, 70, 602 P2d 272 (1979)).

In *State v. Simonsen*, 319 Or 510, 512, 878 P2d 409 (1994), the court followed *Haynes* and held that the police had violated the defendant's Article I, section 12, rights when they interrogated him "without informing him of the fact that he had a court-appointed lawyer or the fact that the lawyer had asked to consult with defendant before further interrogation took place." The court then stated that its rationale for suppressing the statements that the defendant had made during that interrogation was

" 'to preserve * * * rights to the same extent as if the government's officers had stayed within the law. * * * In the context of a criminal prosecution, the focus then is on protecting the individual's rights *vis-a-vis* the government * * *.

" 'This focus on individual protection under the exclusionary rule, a rule that operates to vindicate a constitutional right in the courts, supports the constitutional rule * * *. [T]he constitutionally significant fact is that the Oregon government seeks to use the evidence in an Oregon criminal prosecution. Where that is true, the Oregon constitutional protections apply.' "

*Id.* at 518-19 (quoting *State v. Davis*, 313 Or 246, 253-54, 834 P2d 1008 (1992)) (alterations in original; internal citations omitted). In the *Davis* case that the court in *Simonsen* quoted, the court held that evidence obtained in violation of a suspect's rights to be free of unreasonable search and seizure under Article I, section 9, of the Oregon Constitution must be suppressed, and explained that, to give effect to constitutional rights, the government cannot "obtain a criminal conviction through the use of evidence obtained in violation of [those rights]." *Davis*, 313 Or at 253.

*Davis* in turn relied on two earlier cases—*State v. Davis,* 295 Or 227, 666 P2d 802 (1983), and *State v. Isom,* 306 Or 587, 761 P2d 524 (1988). In the former case, the court noted that, although every rule of law is intended to deter contrary conduct and is successful when it does so, deterrence does not constitute a constitutional basis for the exclusion of evidence. *Davis,* 295 Or at 234-35. Instead, the court stated, " '[i]n demanding a trial without such evidence, the defendant invokes rights personal to himself.' " *Id.* at 235 (quoting *State v. McMurphy,* 291 Or 782, 785, 635 P2d 372 (1981)). In the latter case, the court ordered suppression of statements made in violation of Article I, section 12, because "the state may not prove, over objection, any crime with unconstitutionally obtained evidence." *Isom,* 306 Or at 595.

Synthesizing the decisions that we have reviewed, and applying our own constitutional analysis, we now set out the basis for the requirement that police inform persons in custody and subjected to custodial interrogation of the rights afforded by Article I, section 12, and for excluding statements made without the benefit of those warnings.

Article I, section 12, affords a constitutional right to remain silent. That right is, however, subject to waiver. Because a custodial interrogation is inherently compelling, and to ensure the validity of a waiver of the right against self-incrimination, Article I, section 12, requires that the police inform a person subjected to custodial interrogation that he or she has a right to remain silent and to consult with counsel and that any statements that the person makes may be used against the person in a criminal prosecution. Article I, section 12, requires those *Miranda* warnings to ensure that a person's waiver is knowing as well as voluntary. If the police conduct a custodial interrogation without first obtaining a knowing and voluntary waiver of the suspect's rights, then they violate the suspect's Article I, section 12, rights. To give effect to those constitutional rights, the state is precluded from using, in a criminal prosecution, statements made in response to the interrogation.

With that understanding, we return to the state's alternative argument that we should adopt a rule that permits the admission of physical evidence that the police obtain

without the benefit of *Miranda* warnings. In making that argument, the state concedes that, if the constitutional violation at issue results from "actual coercion," then all evidence, including physical evidence, obtained as a result of the violation must be excluded from evidence. *See Soriano*, 68 Or App at 662-65 ("Prohibition of the use of the fruits of illegal police activity in court is necessary to vindicate the violated rights."); *Patane*, 542 US at 644 (acknowledging that Fifth Amendment requires that physical evidence derived from actually coerced statements must be suppressed); *United States v. Hubbell*, 530 US 27, 37-38, 120 S Ct 2037, 147 L Ed 2d 24 (2000) (holding that Fifth Amendment requires that evidence derived from coerced statements must be suppressed). So, for example, if the police were to engage in "actual coercion" to compel the answer to the question "where is the gun located?," both the answer, "under the bed," and the gun found in that location would be suppressed. *See State v. Miller*, 300 Or 203, 709 P2d 225 (1985) (physical evidence derived from an unconstitutional custodial interrogation must be suppressed unless admissible on some independent ground).[7]

■■ The state contends, however, that we should reach a different conclusion when the violation of Article I, section 12, is a "mere failure to provide *Miranda* warnings" relying on the reasons persuasive to the plurality in *Patane*: that such a failure does not violate a suspect's constitutional rights and that, given the important value of reliable physical evidence, the *Miranda* rule should not be extended to exclude it. It is immediately obvious that the premise of the state's argument does not hold here. It is the Oregon Constitution that requires *Miranda* warnings and it is the Oregon Constitution that is violated when those warnings are not given. When the police violate Article I, section 12, whether that violation consists of "actual coercion" or the failure to give the warnings necessary to a knowing and

---

[7] In *Miller*, the police found physical evidence when the defendant handed them the keys to a hotel room. Before the defendant did so, he had told the police that he did not want to talk to them without a lawyer. The police had disregarded that statement and continued their questioning. It was then that the defendant handed over the keys. The court found that the defendant had asserted, and not waived, his right to counsel under the Fifth Amendment. *Id.* at 224.

voluntary waiver, the state is precluded from using evidence derived from that violation to obtain a criminal conviction. It follows ineluctably that, when the police violate Article I, section 12, by failing to give required *Miranda* warnings, the state is precluded from using physical evidence that is derived from that constitutional violation to prosecute a defendant.[8]

 It is now incumbent on us to apply the principles that we have enunciated to the facts of this case. As noted, defendant was in custody, in the back seat of a patrol car and hand-cuffed, when the police subjected him to custodial interrogation. Defendant had the right to remain silent and to advice of counsel, but the police conducted their custodial interrogation without obtaining a valid waiver of those rights. When they did so, the police violated Article I, section 12. That constitutional violation requires suppression of both the answers that defendant gave in response to, and the marijuana that the police identified and seized as a result of, that interrogation.

In response to the police officer's first unwarned question, the officer learned that the backpack belonged to defendant. In response to the officer's second unwarned question, the officer learned that there was marijuana in the backpack. With that relevant information, the officer then immediately requested consent to search the backpack and seized the marijuana. In this court, the state makes no argument that the request for consent to search or the seizure of the marijuana derived from some source other than defendant's answers to those unwarned questions, nor does the state argue that, even without defendant's responses, the police inevitably would have obtained the marijuana. Thus, in this case, we conclude that the marijuana derived from the

---

[8] We note that the result we reach is consistent with that of other state courts that have decided the same issue under their state constitutions. *See, e.g., State v. Peterson*, 181 Vt 436, 923 A2d 585 (2007) (physical evidence obtained in violation of *Miranda* rights must be excluded at trial as "fruit of poisonous tree"); *Commonwealth v. Martin*, 444 Mass 213, 827 NE2d 198 (2005) (physical evidence derived from unwarned statements presumptively excludable from evidence as "fruit" of improper failure to provide such warnings); *State v. Knapp*, 285 Wis 2d 86, 700 NW2d 899 (2005) (physical evidence obtained as direct result of intentional *Miranda* violation excluded as "fruit of poisonous tree").

violation of defendant's Article I, section 12, rights, and the trial court erred in failing to exclude it from evidence. We affirm the decision of the Court of Appeals in that regard.

## II. BELATED *MIRANDA* WARNINGS

The second question in this case is the consequence that a violation of Article I, section 12, should have when the police belatedly administer required *Miranda* warnings. The state argues that, after the police give the required warnings, a defendant's statements in response to further interrogation are admissible as long as they are voluntary. Defendant argues that the constitutional violation that occurs when the police fail to give the warnings when initially required necessitates exclusion of all statements made as a result of the illegality and that that category includes statements made after belated *Miranda* warnings, unless the state demonstrates, under *Hall*, that, at the time the post-*Miranda* statements were made, the taint of the illegality had been attenuated.

Two Supreme Court cases illustrate the range of factual circumstances that present that issue. In *Oregon v. Elstad*, 470 US 298, 105 S Ct 1285, 84 L Ed 2d 222 (1985), the police contacted a young suspect at his home to arrest him for burglary. Before the arrest, one officer spoke with the mother, while the other officer mentioned to the suspect that he felt that the suspect had been involved in the burglary. The suspect admitted that he had. The officers then placed the suspect under arrest and took him to the police station where they administered *Miranda* warnings and, when the suspect waived his rights, interrogated him. The defendant was charged with burglary and sought to suppress his post-*Miranda* statements as the illegal "fruit" of the *Miranda* violation.

The Court rejected defendant's argument. It ruled that the admissibility of any such statement turns "solely on whether it is knowingly and voluntarily made." *Id.* at 309. In considering whether the defendant's post-*Miranda* statements met those standards, the Court discounted whatever psychological impact that his unwarned statements could have had on his later waiver of his Fifth Amendment rights and found the warned statements admissible because the

connection between the defendant's prior admission and his ultimate decision to cooperate was "speculative and attenuated at best." *Id.* at 312-14.

In 2004, the Supreme Court again explored the issue of belated *Miranda* warnings in *Missouri v. Seibert*, 542 US 600, 124 S Ct 2601, 159 L Ed 2d 643 (2004). In that case, the officer had made a "conscious decision" to withhold *Miranda* warnings. The officer conducted the interrogation in the station house, and the interrogation was "systematic, exhaustive, and managed with psychological skill." *Id.* at 616. The defendant made incriminating statements in response to the interrogation. Then, after a pause of only 15 to 20 minutes, the same officer, in the same place, recited the *Miranda* warnings but did not advise the defendant that her prior statements could not be used. In fact, the officer referenced the defendant's earlier statements and used them to convince her to repeat her earlier confesson. Justice Souter wrote for four members of the court and concluded that all of the defendant's post-*Miranda* statements must be suppressed, not as the "fruit" of a prior unlawful act, but because the state had not established that the belated *Miranda* warnings were "effective." *Id.* at 604 (plurality opinion).

The plurality explained its reasoning as follows:

"Just as 'no talismanic incantation [is] required to satisfy [*Miranda's*] strictures,' *California v. Prysock*, 453 US 355, 359[, 101 S Ct 2806, 69 L Ed 2d 696] (1981) (*per curiam*), it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance. 'The inquiry is simply whether the warnings reasonably "convey[y] to [a suspect] his rights as required by *Miranda*." ' *Duckworth v. Eagan*, 492 US 195, 203[, 109 S Ct 2875, 106 L Ed 2d 166] (1989) (quoting *Prysock, supra*, at 361). The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in

a position to make such an informed choice, there is no prac-
tical justification for accepting the formal warnings as com-
pliance with *Miranda,* or for treating the second stage of
interrogation as distinct from the first, unwarned and inad-
missible segment."

*Id*. at 611-12 (alterations in original; footnote omitted).

The *Seibert* plurality identified, in the contrast
between *Elstad* and *Seibert,* a "series of relevant facts that
bear on whether *Miranda* warnings delivered midstream
could be effective enough to accomplish their object[.]"
*Seibert,* 542 US at 615. Those facts include: (1) the complete-
ness and detail of the questions and answers in the first
round of interrogation, (2) the overlapping content of the two
statements, (3) the timing and setting of the first and the sec-
ond rounds of interrogation, (4) the continuity of police per-
sonnel, (5) the degree to which the interrogator's questions
treated the second round as continuous with the first, and
(6) whether the police cautioned that the earlier unwarned
statement could not be used in any subsequent prosecution.
*Id*. at 615-16.

Justice Kennedy concurred in the judgment, but his
approach to the issue was different. Justice Kennedy opined
that the question-first technique "creates too high a risk that
postwarning statements will be obtained when a suspect was
deprived of knowledge essential to his ability to understand
the nature of his rights and the consequences of abandoning
them." *Id*. at 621 (internal quotation marks and citation
omitted). He concluded that the post-warning statements
should be excluded only when that technique is used delib-
erately. *Id*. at 622. When the police purposely engage in a
two-step interrogation, Justice Kennedy opined, "postwarn-
ing statements that are related to the substance of prewarn-
ing statements must be excluded absent specific, curative
steps." *Id*. at 621. Justice Kennedy explained that curative
measures "should be designed to ensure that a reasonable
person in the suspect's situation would understand the
import and effect of the *Miranda* warning and of the *Miranda*
waiver[ ]" and could include, for example, a substantial break
in time and circumstances or an additional warning that the

prior unwarned statements would likely be inadmissible. *Id.* at 622.

Justice O'Connor, the author of *Elstad*, penned the dissent for the four remaining members of the court. She agreed with the plurality that the test of admissibility should be an objective one and not determined, as Justice Kennedy urged, by whether the police acted intentionally:

> "A suspect who experienced exactly the same interrogation as Seibert, save for a difference in the undivulged, subjective intent of the interrogating officer when he failed to give *Miranda* warnings, would not experience the interrogation any differently. Whether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights."

542 US at 624-25 (internal quotation marks and brackets omitted). For Justice O'Connor, the correct issue was whether, under all the circumstances, the post-warning statements were voluntary. *Id.* at 628.

Because we analyze the issue under the Oregon, and not the United States, Constitution, we are not bound by the Court's decisions in either *Elstad* or *Seibert*. Nevertheless, we find the reasoning in those cases helpful because they focus, as we must, on the source and purpose for the *Miranda* requirement and the exclusion of evidence obtained when *Miranda* warnings are not given as required.

As our prior discussion indicates, the Oregon Constitution does not require the exclusion of evidence obtained in the absence of *Miranda* warnings to deter illegal police conduct. The Oregon Constitution requires *Miranda* warnings to ensure that a waiver of the rights conferred by Article I, section 12, is knowing as well as voluntary. When the police fail to give the required warnings, a suspect's responses to their unwarned questions must be excluded from evidence. When the police then correct course and give the required warnings, the relevant inquiry must be whether the belated warnings are effective and accomplish the purpose for which they are intended. The fact that the police initially violate a defendant's constitutional rights by failing to

give the warnings necessary to a valid waiver does not preclude a defendant from later validly waiving those rights. If the state establishes that the police accurately and effectively, although belatedly, gave the suspect the information necessary to a valid waiver of the right against self-incrimination, then, under the Oregon Constitution, a suspect's subsequent voluntary statements will be admissible.[9] In arriving at that conclusion, we adopt the reasoning and the analysis of the *Siebert* plurality as our own.

When the police give *Miranda* warnings at the time that they are first required, the constitution does not demand that the state establish that the warnings were effective. The state need only establish that the police recited the warnings completely and coherently.[10] The problem that *Seibert* demonstrates, however, is that when the police question first and warn later, their exhibition and exercise of authority and violation of the defendant's constitutional rights may communicate to a defendant, as the Court believed they did in that case, that, before the defendant will be released, he or she must answer the questions asked. In that circumstance, the police not only fail to provide the defendant with the information necessary to a valid waiver—that the defendant has a right to remain silent and to confer with an attorney—the police also convey a contrary message. In that situation, when the police later administer *Miranda* warnings, we cannot assume that the mere recitation of *Miranda* warnings is sufficient to serve the intended informative function.

That being said, we note that *Seibert* is at one end of the range of the factual circumstances that present the issue that we address. *Elstad* is at the other. Not every instance in which the police question first and warn later communicates a mixed message. Whether and to what extent police officers

---

[9] Voluntariness of course is always a requirement for admission of a defendant's incriminating statements. Even warned statements may be inadmissible if they are not otherwise voluntary. *See State v. Montez*, 309 Or 564, 572, 789 P2d 1352 (1990) (assessing voluntariness of statements made after warnings were administered and defendant made "equivocal" remarks regarding request to consult with attorney).

[10] We acknowledge, of course, that a defendant is entitled to demonstrate (whether by defendant's own testimony or otherwise) that the defendant's waiver was not knowing. So, for example, a defendant may demonstrate that he or she did not understand the warnings due to cognitive or linguistic limitations.

who fail to administer *Miranda* warnings before beginning custodial interrogation obfuscate or contradict the information that *Miranda* warnings are intended to convey and whether and to what extent those officers later correct that misinformation are issues that trial courts must confront and determine. In doing so, courts should consider all relevant circumstances, including those facts to which the plurality in *Seibert* pointed—the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the statements given by the suspect, the timing and setting of the first and the second interrogation sessions, the continuity of police personnel, the degree to which the interrogator's questions treated the second round of interrogation as continuous with the first, and whether the police cautioned that the earlier unwarned statement could not be used in any subsequent prosecution.[11]

█ In this case, the Court of Appeals used many, if not all, of those facts in its "fruit of the poisonous tree," or "exploitation," analysis. The difference between that court's analysis and our own is not in the facts considered but in the stick by which we require that they be measured. In our analysis, the test of the efficacy of the belated warnings is an objective one. A court considers the factual circumstances to determine the accuracy and effectiveness of the information that the police convey; a court does not use those circumstances to attempt to determine the psychological effect that the particular police course of conduct had on the particular defendant or whether the initial failure to warn caused the particular defendant to make the post-*Miranda* statements.

█ Although neither party in this case advocates for the view articulated by Justice Kennedy in *Seibert*—that the admissibility of statements that a defendant makes after *Miranda* warnings are belatedly given should be determined by whether the police intentionally engaged in a two-step interrogation process—we think it helpful to state explicitly

---

[11] We note that other state courts applying their state constitutions also have used multi-factor tests to determine the admissibility of post-*Miranda* statements. *See State v. O'Neill*, 193 NJ 148, 180-81, 936 A2d 438 (2007); *People v. Paulman*, 5 NY3d 122, 130-31, 833 NE2d 239 (2005); and *State v. Northern*, 262 SW3d 741, 763-64 (Tenn 2008).

that we reject that approach. Our focus is not on the subjective intent of the police but on the objective message that the police actually convey by the techniques that they use and the warnings that they give. That does not mean, however, that the deliberateness with which the police act is entirely irrelevant. In *Isom*, for instance, the defendant established that the police had purposely disregarded his request for counsel, and this court did not hesitate to hold that the statements that he made thereafter were obtained in violation of Article I, section 12. 306 Or at 595. If the police purposely obscure the legal and practical significance of a belated *Miranda* admonition, as they did in *Seibert*, it will not be difficult for a court to determine under the objective test that we describe today that the police did not accurately and effectively deliver the information necessary to a valid waiver of Article I, section 12, rights.

 Finally, it remains for us to decide whether the trial court in this case erred in admitting defendant's post-*Miranda* statements. To do so we must review the facts in more detail than initially stated.

 This case arose from a routine roadside stop of a car to investigate a traffic violation and possible driving under the influence of intoxicants. Defendant was a passenger in the car, which a friend was driving. Officer Stoneberg made the stop; a second officer, Officer Espelien, arrived shortly afterward. Stoneberg approached the driver's side of the car and, as he did, smelled a strong odor of fresh marijuana. Espelien approached the passenger's side and initially waited near the rear corner of the car while Stoneberg talked to the driver. Espelien, likewise, smelled a very strong odor of fresh marijuana. Both officers thought that the smell was strongest towards the trunk area of the car. Espelien approached defendant (the passenger) to ask him for identification. Defendant initially lied about who he was but then gave Espelien the correct information. Espelien discovered an outstanding warrant for defendant. Stoneberg therefore arrested defendant, handcuffed him, and had him sit in the back of the patrol car while he completed his investigation. Stoneberg did not give *Miranda* warnings to defendant at that point because he ordinarily does not conduct any kind of

investigation or ask questions of a person arrested on an outstanding warrant.

Stoneberg continued his investigation of the driver. He asked her if there were any illegal drugs or weapons in the car. She said no. Stoneberg then asked her for, and the driver gave, consent to search the car. In the course of the search, Stoneberg opened the car trunk, at which point the smell of fresh marijuana became even stronger. The only thing in the trunk was a backpack. According to Stoneberg, the smell from the backpack "is what really hit [him]" and, upon lifting it, he could tell that the backpack was not empty. At that point, given the smell and the weight of the backpack, Stoneberg believed that there was a substantial quantity of marijuana in it. Stoneberg asked the driver if the backpack was hers and if he could open it, and she told Stoneberg that it did not belong to her. He asked her who owned it, and she said she did not know.

Stoneberg then walked to the patrol car with the backpack, opened the back door, and asked defendant if the backpack belonged to him. Defendant said yes. Stoneberg asked defendant if there was marijuana inside, and defendant said yes. Stoneberg asked if he could search the backpack, and defendant told Stoneberg he could. Stoneberg then searched the backpack while standing by the patrol car, in defendant's presence, and found two folded-down grocery bags, each containing fresh marijuana.

After searching the backpack, Stoneberg walked over to Espelien and consulted with him. After about five minutes, Stoneberg went back to the patrol car to ask defendant more questions about the marijuana. At that point, he gave defendant *Miranda* warnings. He asked defendant if he understood his rights, and defendant said he did. Defendant waived his rights and agreed to answer Stoneberg's questions. Stoneberg asked defendant several questions about the marijuana. In particular, Stoneberg asked defendant where he got the marijuana; defendant explained that he had gotten it in Tualatin the day before. Stoneberg asked how much marijuana was in each bag; defendant told him that each bag contained about a quarter of a pound of marijuana. Stoneberg asked how much the marijuana cost; defendant

said that he had paid a total of $2,200 for the marijuana. Stoneberg asked defendant if he was a middleman. Defendant answered yes. Eventually, Stoneberg told defendant that he would like to know more about his middleman role. In response, defendant told Stoneberg that he wanted a lawyer. Neither Stoneberg nor Espelien asked defendant any further questions. The post-*Miranda* questions took place intermittently over a 15- to 20-minute time period.

Both officers described their contact with defendant as conversational in tone. Espelien further described defendant, once defendant gave his correct identification to Espelien, as seeming apologetic and even ashamed of the circumstances. Defendant remained "very cooperative" and willingly answered questions until, when Stoneberg asked for more information about his role as a middleman, he invoked his right to counsel.

We now consider all those facts to determine whether the *Miranda* warnings, when given, accurately and effectively conveyed the information necessary to a knowing and voluntary waiver of the right against self-incrimination. We first observe that there was a marked difference in the questioning before and after Stoneberg administered the *Miranda* warnings. The unwarned questions were routine in nature and consumed less than a minute of time.[12] The second warned questions were significantly more detailed and probing. This was not a situation, like that in *Seibert,* in which the police conducted extensive questioning and elicited significant detailed facts in the first interrogation session and then repeated that questioning post-*Miranda.*

Second, although Stoneberg posed the second set of questions shortly after the first set, there was a break in the questioning. Given that the first set of questions consumed less than a minute, the five-minute break between questions, followed by the *Miranda* warning, was an objective indication that the situation had changed and was governed by new rules. Again, this was not a circumstance, like that in *Seibert,* in which both interrogation sessions were protracted and

---

[12] Given the brevity of the initial three questions that Stoneberg asked, and the one word answers that defendant gave in reply, the total amount of time involved for all three questions would have been a matter of perhaps only 30 seconds or less.

conducted at the police station. In such a circumstance, a short break between interrogation sessions would not be of the same import.

Third, although Stoneberg did not caution defendant that his earlier unwarned statements could not be used in any subsequent proceeding, neither did he point out to defendant, as did the officer in *Seibert*, that defendant had already made incriminating disclosures that provided all of the information that Stoneberg needed. And in fact, at least some of the information that Stoneberg had obtained—that the backpack contained marijuana—was obviously discernable from another source—the odor of the backpack itself. When an officer does caution a defendant that the unwarned statements that the defendant made may not be admissible, that caution may militate (indeed, often will) in favor of finding that the officer's belated *Miranda* warnings were effective, but such a caution is not necessary to that result.

Fourth, although defendant was under arrest and handcuffed when Stoneberg questioned him and was thus in inherently compelling circumstances, he was not subjected to additional coercion. The police conducted their questioning in a conversational tone and it was of short duration.

The facts that we have outlined lead us to conclude that the belated *Miranda* warnings that Stoneberg gave accurately and effectively communicated that defendant had, from that time forth, a right to remain silent. We therefore agree with the trial court, although for different reasons, that defendant's post-*Miranda* statements should have been admitted.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**LINDER, J.,** concurring.

I write separately to explain my reasons for concurring in the majority decision, both with respect to the physical evidence that police obtained when defendant, before being given *Miranda* warnings, consented to the search of his

backpack and with respect to the statements that defendant made after being given *Miranda* warnings.

In urging that the marijuana seized from defendant's backpack should not be suppressed, the state has advanced an ambitious argument seeking a *per se* rule that physical evidence is never subject to exclusion under Article I, section 12, reasoning that the protection against self-incrimination is directed to testimonial in-court evidence only. I concur in the majority's rejection of that *per se* rule. As this court has described it, our state-law based *Miranda* rule is "a judicial means" to secure the guarantee against compelled self-incrimination, one that this court has devised because it is appropriate for this court "to specify the procedure by which [Article I, section 12's guarantee against compelled testimony] is to be effectuated." *State v. Mains*, 295 Or 640, 645, 669 P2d 1112 (1983).[1] Thus, the rule is constitutionally grounded, even if *Miranda* warnings and waiver of them are procedures that the constitution does not itself mandate. When those procedural requirements are violated, we properly ask whether any subsequently obtained evidence, physical or testimonial, is sufficiently a product of that violation to require suppression along with any statements made in direct response to unwarned custodial interrogation. And because the *Miranda* doctrine is a judicially devised procedural protection, one this court has adopted as a matter of state law, it falls to this court to determine whether and

---

[1] I accept that this court has adopted *Miranda* warnings as an independent requirement under Article I, section 12. The pedigree of that doctrine is, however, uncertain. In the one case in which the court attempted to decide, consistently with our announced methodology for interpreting original provisions of our constitution, whether a *Miranda*-type rule could be divined from Article I, section 12, three members (of a six-member court) concluded that the answer was no, while three others believed the answer was yes, but only two believed that the rule could extend to anything other than formal custody or arrest. *See State v. Smith*, 301 Or 681, 725 P2d 894 (1986). Since then, without exploring the interpretative basis for an independent state *Miranda* rule, this court has, for the most part, assumed the existence of that rule. *See, e.g., State v. Magee*, 304 Or 261, 744 P2d 250 (1987) (per curiam decision, with three members concurring). *But see State v. Isom*, 306 Or 587, 592, 761 P2d 524 (1988) ("majority of this court has not agreed whether *Miranda*-type warnings are required under the Oregon Constitution"); *State v. Kell*, 303 Or 89, 734 P2d 334 (1987). It may well be that, at some point, in deciding novel questions about the scope or content of our state *Miranda* rule, this court will have to engage in that interpretative exercise. For present purposes, however, it is unnecessary to do so.

under what circumstances to exclude evidence to serve the objectives of that procedural rule.

The difficulty here is that the state's argument on review stops with its invitation to adopt a *per se* rule of no exclusion. The state does not explore what test this court should adopt to determine whether and when physical evidence obtained after a *Miranda* violation should be subject to exclusion. Because of that omission, I concur in the result that the majority reaches. I write separately, however, to identify the limits of the majority's reasoning and to point out the work that remains for future cases.

The majority announces a "derives from" test to determine under what circumstances consent to search, when that consent follows a *Miranda* violation, must be suppressed. 348 Or at 475-76. The starting point of such a test should be the underlying *Miranda* violation, because the nature and extent of that violation necessarily bear on whether and to what extent other evidence that police obtain is connected to that violation.

Here, the investigating officer asked defendant a total of three questions without first giving *Miranda* warnings. The first question was whether defendant owned the backpack. At trial, and continuing through the layers of appeal, the state has conceded that the officer was required to give defendant *Miranda* warnings and obtain a waiver before asking that question. For present purposes, I will assume that concession is correct.[2]

---

[2] It is worth noting, however, that the issue is potentially a close one. In many circumstances, when police conducting a field investigation need to ascertain the owner of property in order to ask for consent to search that property, their inquiry may not qualify as "interrogation" that must be preceded by *Miranda* warnings. Here, the officer needed to determine who owned the backpack to ask for consent to search it, among other reasons. The backpack could have belonged to the driver, even though she denied that it did. It could have belonged to defendant. It could also have belonged to the driver's parents, who owned the car, or to some other third party. In such a circumstance, attempting to determine the identity of the owner may potentially qualify as the kind of routine questioning normally attendant to investigatory activities, or even to custody and arrest, that does not trigger the requirement of *Miranda* warnings. *See generally* Wayne R. LaFave, 2 *Criminal Procedure* § 6.7(b) (3d ed 2007) (general investigatory questions not ordinarily considered interrogation; citing representatives cases). In an appropriate case, that issue may merit closer attention than it has received in this case.

The officer's second question was whether there was marijuana in the backpack. That question was, quintessentially, interrogation. Any reasonable officer asking if a container has marijuana in it would know that the question could elicit an incriminating response—*i.e.*, an inculpatory or an exculpatory response that the prosecution might seek to use at trial.[3] To lawfully ask defendant—who was under arrest—*that* question, the officer was required to advise defendant of his *Miranda* rights. The officer did not do so.

The officer's third question asked if defendant would consent to a search of the backpack. That was not impermissible interrogation. Asking for consent to search is a mere request for permission. The answer either gives permission or it does not; the response is neither inculpatory or exculpatory (although, to be sure, the results of the search can be). With apparent unanimity, courts throughout the country that have considered the question have held that asking for consent to search is not interrogation within the meaning of the *Miranda* doctrine. *See, e.g., U.S. v. Smith*, 3 F3d 1088, 1098 (7th Cir 1993), *cert den*, 510 US 1061 (1994) (so observing; citing representative cases). Defendant has never contended to the contrary in this case.

Thus, at best for defendant, the *Miranda* violation in this case consisted of two short questions, each of which called for a one word (yes or no) response. In analyzing whether the physical evidence seized pursuant to defendant's consent was "derived" from that violation, the majority concludes—with only brief discussion—that it was. 348 Or at 475-77. It is unclear what test the majority's "derived from" test entails. The majority does not explain whether the test turns on causation, or exploitation, or some other way in which an initial illegality may be said to "taint" evidence that police gather after that illegality. Knowing the nature of the "derives from" test that applies is important. The majority appears to conclude that there is, in fact, a "derived from"

---

[3] "Interrogation," both for federal and state law purposes, is express questioning, as well as words or actions on the part of police (other than those normally attendant to arrest and custody), that the police should know are reasonably likely to produce an incriminating response, whether inculpatory or exculpatory. *State v. Scott*, 343 Or 195, 202, 166 P3d 528 (2007) (adopting test from *Rhode Island v. Innis*, 446 US 291, 301, 301 n 5, 100 S Ct 1682, 64 L Ed 297 (1980)).

connection between the illegal questioning and defendant's consent to search in this case, and therefore places the burden on the state to disprove that connection. 348 Or at 476-77. At the least, if the state is to have that burden, it must know what it must disprove. As important, at some point, both litigants and lower courts are entitled to meaningful guidance as to the analysis that applies. *Compare Wong Sun v. United States*, 371 US 471, 487-88, 83 S Ct 407, 9 L Ed 2d 441 (1963) ("but for" causation not enough to establish that consent to search is the product of a prior illegality), *with State v. Hall*, 339 Or 7, 34-35, 115 P3d 908 (2005) (defendant need only show a "minimal causal nexus" between consent to search and prior illegality).

The state's argument, as advanced in this court, examines none of those issues, however.[4] Instead, as I have already noted, the state argues only that, as a *per se* matter, physical evidence is never subject to suppression under Article I, section 12, no matter how directly and immediately derivative of a *Miranda* violation. In this particular case, given the fact that the state has made no contrary argument, I am prepared to conclude that, under the particular circumstances of this case, the officer's request to search was part and parcel of the impermissible unwarned questioning, at least enough to place the burden on the state to point to the circumstances that either legally or factually break that connection. Because the state has not done so, I concur. But it remains for future cases to explore, in a way that we do not in this case, when evidence obtained after a *Miranda* violation properly can be said to "derive from" that violation.

With respect to defendant's subsequent, post-*Miranda* warning statements, the majority essentially

---

[4] The state also has not argued on review that the officers had probable cause to believe that the backpack contained marijuana, based solely on the odor of marijuana coming from it, and that they could therefore seize and search it under the automobile exception. *See State v. Meharry*, 342 Or 173, 149 P3d 1155 (2006) (discussing that exception to the warrant requirement). The prosecution relied on that theory in the trial court, and the trial court made an explicit finding that the automobile was mobile at the time of the stop. Even though the trial court may have relied on that exception as an independent and alternative ground for its ruling, the state did not raise the automobile exception in the Court of Appeals. The state therefore cannot (and, as noted, does not) rely on that exception in this court. *See Tarwater v. Cupp*, 304 Or 639, 644, 748 P2d 125 (1988) (on review in this court, party may not argue alternative ground for affirmance of trial court if that argument was not presented to Court of Appeals).

adopts the test articulated by the plurality decision in *Missouri v. Seibert*, 542 US 600, 124 S Ct 2601, 159 L Ed 2d 643 (2004). 348 Or at 480-81. That test asks whether, viewed from the perspective of a reasonable person, the *Miranda* warnings that police give after an initial *Miranda* violation were effective for purposes of informing a suspect of his rights and obtaining a knowing and voluntary waiver of those rights.

I have no objection to that test. I see, ultimately, little or no difference in the "totality of the circumstances" analysis used to analyze that issue and the totality of the circumstances test that has long been in place to analyze the voluntariness of a confession following prior illegal conduct by police. *See, e.g., State v. Wolfe*, 295 Or 567, 572, 669 P2d 320 (1983) (drawing from totality of circumstances test in *Brown v. Illinois*, 422 US 590, 603-04, 95 S Ct 2254, 45 L Ed 2d 416 (1975)).

What is important to emphasize, however, is the distinctive context in which the *Seibert* plurality fashioned that test. The *Seibert* plurality identified that context in the very first sentence of the opinion: the case involved what had become, at least at the time, an increasingly popular "police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession," after which warnings are given and police then "lead[ ] the suspect to cover the same ground a second time." 542 US at 604. As the plurality noted, "the reason that question-first [technique] is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset[.]" *Id.* at 613. The plurality therefore, throughout its opinion, expressly tied its "effective waiver" test to the question-first technique of interrogation—*e.g.*, a confession "so obtained" (*id.* at 611); one obtained through the use of a "question first and warn later" protocol (*id.*); and one in which *Miranda* warnings are "inserted in the midst of coordinated and continuing interrogation" (*id.* at 613). That distinctive context also was what led the plurality to observe that belated *Miranda* warnings might be unlikely to provide a defendant with the knowledge necessary for a valid waiver, reasoning that it "would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning

as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle." *Id.* at 614.

The plurality in *Seibert* also expressly contrasted the circumstances before it with those that had been involved in *Oregon v. Elstad*, 470 US 298, 105 S Ct 1285, 84 L Ed 2d 222 (1985), noting that the Court in *Elstad* had taken care to characterize the officer's initial failure to give *Miranda* warnings in that case as an "oversight." *Seibert*, 542 US at 614. The plurality considered the facts in *Seibert* to be "[a]t the opposite extreme" and by "any objective measure" to reveal a police strategy adapted to undermine the effectiveness of the *Miranda* warnings. *Id.* at 616. The plurality observed the "unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid." *Id.* In addition, the circumstances of the questioning did not change in any meaningful way between the initial round of questioning and the later round. And when police resumed their questioning and asked the defendant to cover the same ground a second time, they "fostered" the impression that the later round was a mere continuation of the first by reminding the defendant of the confession that she had already given them. *Id.*

As other courts have emphasized in adopting the equivalent of the *Seibert* plurality's "effective waiver" test, an examination of the totality of the circumstances for an objective person's perception of those circumstances permits no "bright-line rule." *State v. O'Neill*, 193 NJ 148, 181, 936 A2d 438, 457 (2007). But because the test focuses on the circumstances as they would be *objectively* perceived, we should acknowledge that the danger of rendering *Miranda* warnings a nullity is greatest at the *Seibert* end of the factual spectrum. Likewise, that danger is at its lowest ebb at the *Elstad* end of the factual spectrum, where no question-first technique or protocol objectively appears to have been at work, where the initial questioning is minimal and the unwarned statements are more limited and less detailed than later ones, and where, given what went before the warnings, there

is some substantial break in the circumstances.[5] The facts of this case readily bring it within the class of cases in which, objectively, the circumstances of the initial *Miranda* violation are not such that they rendered the belated *Miranda* warnings or defendant's waiver of his *Miranda* rights ineffective. The majority reaches the correct conclusion in that regard.

For those reasons, I respectfully concur.

Balmer and Kistler, JJ., join in this concurrence.

---

[5] In a case that falls on the *Elstad* end of the spectrum, *Miranda* warnings themselves will often provide the needed substantial "break" in the circumstances. In a case that falls on the *Seibert* end of the spectrum, *Miranda* warnings alone may rarely suffice. In such a case, among other possible attenuating circumstances, advice that the earlier unwarned statements probably are not admissible against the defendant is a significant intervening factor that will weigh heavily on the side of rendering the subsequent warned statements admissible.