Argued and submitted December 16, 2010, affirmed August 3, 2011

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## RYAN TAYLOR JOHNSON,
*Defendant-Appellant.*

Washington County Circuit Court
C062629CR; A137581

260 P3d 782

David O. Ferry, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Tiffany Keast, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Rosenblum, Senior Judge.

WOLLHEIM, J.

## WOLLHEIM, J.

Defendant was convicted of robbery in the second degree. On appeal, he raises two assignments of error: (1) that the trial court erred in denying his motion to suppress statements he made to sheriff's deputies after receiving *Miranda* warnings because the deputies had previously questioned him without first giving him those warnings; and (2) that the trial court imposed an unconstitutionally cruel and unusual 70-month sentence for his second-degree robbery conviction. We affirm.

Viewing the record in the light most favorable to the state, we review the trial court's findings of fact for sufficient evidence in the record and then determine whether the court correctly applied legal principles to those facts. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). "[I]f the trial court did not make findings on all pertinent historical facts and there is evidence from which those facts could be decided more than one way, we will presume that the trial court found facts in a manner consistent with its ultimate conclusion." *State v. Stevens*, 311 Or 119, 127, 806 P2d 92 (1991).

On an April afternoon in 2006, a store employee in Aloha saw defendant walking around the building, looking into the store windows. Defendant was covering his face. A little while later, defendant walked into the store and asked to use the restroom. The employee told defendant that the store did not have a public restroom. Defendant left the store and then returned again a few minutes later, wearing a ski mask and holding a gun. Defendant pointed the gun at the employee and told her to put the money in the bag. The employee put her hands in the air and told defendant that she did not know where the money was because it was her first day. When a second employee came out of the back of the store, defendant ran out of the store.

Defendant was ultimately charged with two counts of robbery in the first degree, one count of robbery in the second degree, and unlawful use of a weapon. In the course of arresting defendant, officers questioned him and he made statements at three distinct times: at the time officers were patting him down for weapons, at the time of his arrest, and at an interview in the police station.

Police received a call from a witness to the robbery. Deputy Roley located defendant's car with plates matching the witness's description. He parked about 15 yards behind defendant's car in a parking lot and asked defendant if he could talk to him. Defendant got out of his car. Roley saw that defendant was also wearing clothing matching the description of the person who had robbed the store and asked defendant where he was coming from. Defendant said that he had come from school. Roley told defendant that he fit the description of the suspect who had robbed the store. Defendant responded that he did not know anything about the store.

Other deputies arrived and performed a patdown of defendant for weapons. From the exterior patdown, the officers felt what seemed to be a weapon and found a loaded magazine in his pocket. Deputy Ward asked defendant if there was anything else in his pockets. Defendant said that there was a gun in his car. As Ward continued the patdown, defendant stated that he had just robbed the store down the street. Ward then put defendant into the patrol car, gave him *Miranda* warnings, and interviewed him.

During the interview in the patrol car, defendant said that he had walked into the front of the store, holding a gun and a plastic bag. Defendant said that there was a magazine in the gun, but no round in the chamber. Although defendant admitted that he had robbed the store, he denied pointing the gun at anyone and said that he had held the gun by his side.

The deputies took defendant to the police station, where he spoke with detectives Rau and Hayes about two hours later. Rau gave defendant *Miranda* warnings again before questioning him. Defendant read the warnings from a card along with Rau and told the detectives that he understood the warnings. Rau said that they hoped to talk to defendant in more detail than they had during the afternoon. Defendant said, "I told just about everything to the officers already. * * * All right. I'll go ahead and talk to you guys." The interview with the detectives lasted approximately one hour.

Before trial, defendant filed a motion to suppress all the statements that he made to the deputies and detectives, arguing that those statements were not voluntary. In a letter opinion, the trial court denied the motion to suppress with one exception: the "evidence of defendant's statements, while being frisked, after he said there was a gun in the vehicle up until defendant was advised of his *Miranda* rights a few moments later."

In a bench trial, the court found defendant guilty of robbery in the second degree with a firearm, a Class B felony. The court found defendant not guilty of the two counts of robbery in the first degree and not guilty of unlawful use of a weapon. The court imposed a 70-month term of incarceration, the minimum required by ORS 137.700,[1] over defendant's objection that imposing that sentence was unconstitutionally cruel and unusual under the circumstances of his case.

Defendant first asserts that the statements he made to the detectives after receiving *Miranda* warnings should have been suppressed because the deputies had previously questioned him without first giving him *Miranda* warnings, in violation of Article I, section 12, of the Oregon Constitution. The state responds that, under *State v. Vondehn*, 348 Or 462, 236 P3d 691 (2010), the warnings were sufficient because they accomplished the purpose for which they were intended. We agree with the state.

With respect to defendant's post-*Miranda* statements, the question is whether, in light of the previous unwarned questioning, the belated *Miranda* warnings were sufficient to ensure that defendant's decision to waive his right to remain silent was voluntary. *State v. Bielskies*, 241 Or App 17, 23, 249 P3d 144, *rev den*, 350 Or 530 (2011). In *Vondehn*, 348 Or at 481, the Oregon Supreme Court adopted the analysis of the plurality in *Missouri v. Seibert*, 542 US 600, 124 S Ct 2601, 159 L Ed 2d (2004), to determine whether *Miranda* warnings delivered in the middle of questioning

---

[1] ORS 137.700(2)(a)(R) provides that the minimum sentence for robbery in the second degree is 70 months.

were effective. In particular, the Oregon Supreme Court followed the plurality's statement that a series of relevant facts bear on whether the warnings were effective. Those facts include:

> "(1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and the second rounds of interrogation, (4) the continuity of police personnel, (5) the degree to which the interrogator's questions treated the second round as continuous with the first, and (6) whether the police cautioned that the earlier unwarned statement could not be used in any subsequent prosecution."

*Vondehn*, 348 Or at 479. The court stated that the test of the efficacy of the belated warnings is an objective one and its focus is "not on the subjective intent of the police but on the objective message that the police actually convey by the techniques that they use and the warnings that they give." *Id.* at 483.

Here, defendant incriminated himself during the patdown search without having first been given *Miranda* warnings. The trial court ruled that those statements were involuntary.[2] Defendant was then given *Miranda* warnings and questioned in the patrol car, and he again admitted that he had robbed the store. Later, at the police station, defendant received *Miranda* warnings again and was questioned again; he again admitted to committing the robbery. Because of the timing of defendant's various statements, the question whether his statements in the patrol car are admissible is a closer call than the question whether his statements in the police station are admissible. We need not decide whether the statements in the patrol car are admissible, however, because we conclude that defendant's statements at the police station are admissible and that, even if the statements in the patrol car are not, admitting them was harmlessly duplicative of his statements at the police station. Accordingly, for purposes of our analysis, we assume, without deciding, that the *Miranda* warnings in the patrol car were ineffective, and, therefore, we treat the statements during the

---

[2] The state does not challenge that ruling, so we do not review it.

patdown and those in the patrol car as the first "round" of questioning under the *Vondehn* analysis.

The first fact that we consider in the *Vondehn* analysis is "the completeness and detail of the questions and answers in the first round of interrogation." *Id.* at 479. Here, Ward testified that defendant's statements during the patdown were along the lines of "I did this robbery" and "[t]he gun is in the vehicle." He testified that the interview in the patrol car lasted "[j]ust a few minutes." Deputy Fish, who was also present during the interview, testified that defendant said that "he never had done anything like this before and that the reason that he did it was because he was going through some hard times." Thus, the questions and answers in the first round of interrogation were brief and lacking in detail.

The second *Vondehn* fact is "the overlapping content of the two statements." *Id.* In contrast with the brevity of the first "round," the interview with the detectives at the police station lasted approximately one hour. In addition, at trial, Rau testified that, during the interview at the police station, defendant gave a detailed confession of the attempted robbery, demonstrating that the questions and answers at the police station were much more detailed and complete than the brief statements defendant made during the patdown and in the patrol car. Although the statements were "overlapping" in the sense that defendant repeated the confession, that is not the sort of overlap with which we are concerned.

A similar overlap was present in *Vondehn*. The defendant there, before receiving *Miranda* warnings, confessed to possessing marijuana found by the police. *Id.* at 484. Later, after receiving the warnings, he answered several questions that assumed that he possessed the marijuana— where he obtained it, how much there was, and how much he had paid for it. *Id.* In analyzing the second factor, the Supreme Court observed that "there was a marked difference in the questioning before and after [the police officer] administered the *Miranda* warnings." *Id.* at 485. It further noted that the "warned questions were significantly more detailed and probing. This was not a situation, like that in *Seibert*, in which the police conducted extensive questioning and elicited

significant detailed facts in the first interrogation session and then repeated that questioning post-*Miranda*." *Id.*

Here, as in *Vondehn*, the police did not conduct extensive questioning before giving effective *Miranda* warnings and then repeat the interrogation at the police station. Accordingly, the overlap—consisting of the bare confessions to the robbery—was not sufficient to undermine the effectiveness of the *Miranda* warnings given at the police station.

The third fact is "the timing and setting of the first and the second rounds of interrogation." *Id.* at 479. In *Vondehn*, the court concluded that a five-minute break was an "objective indication that the situation had changed and was governed by new rules," given that the first set of questions consumed less than a minute, even though both rounds of questioning occurred in the same location. *Id.* at 485. Here, as stated, the timing and setting of the two rounds of interrogation were quite different: the second round occurred at the police station, two hours after the interrogation at the scene of defendant's arrest. Thus, the third factor weighs heavily in the state's favor.

The fourth fact—the continuity of police personnel—also weighs in favor of the state. There was no continuity of police personnel between the interviews here, suggesting that the two interviews were separate conversations, not a single round of interrogation.

The fifth fact is the degree to which the interrogator's questions treated the second round as continuous with the first. The Oregon Supreme Court did not expressly apply the fifth factor in *Vondehn*. However, in *Seibert*, the plurality, whose reasoning the Oregon court adopted in *Vondehn*, explicated that factor. In that case, the interrogating officer had conducted an exhaustive interrogation before giving *Miranda* warnings. *Seibert*, 542 US at 616. After a 15- to 20-minute break, he recited the warnings and then began a second round of questioning by saying, " 'We've been talking for a little while about what happened on Wednesday the twelfth, haven't we?' " *Id.* The plurality stated,

> "The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before."

*Id.* at 616-17.

Here, the second interrogation was treated as continuous with the first only to the extent that Rau said that he and Hayes hoped to talk to defendant in more detail than the deputies had during the afternoon. And, although defendant said that he had already told the deputies "just about everything," he also stated that he understood the *Miranda* warnings when Rau gave defendant the warnings again before questioning him. Under the circumstances, it would not have been unnatural for him to refuse to repeat his earlier confession.

The sixth fact is "whether the police cautioned that the earlier unwarned statement could not be used in any subsequent prosecution." *Vondehn*, 348 Or at 479. As in *Vondehn*, Rau did not caution defendant that his unwarned statements could not be used against him. But the court in *Vondehn* stated that this was not fatal:

> "When an officer does caution a defendant that the unwarned statements that the defendant made may not be admissible, that caution may militate (indeed, often will) in favor of finding that the officer's belated *Miranda* warnings were effective, but such a caution is not necessary to that result."

*Id.* at 486. Accordingly, the fact that Rau did not inform defendant that his previous statements could not be used against him did not necessarily undercut the effectiveness of the warnings that Rau gave.

Considering all of the circumstances here, we conclude that the *Miranda* warnings that Rau gave defendant accurately and effectively communicated to defendant that he had the right to remain silent. The differences in the extent, timing, and location of the questioning and in the police personnel conducting the questioning were sufficient "objective indication[s] that the situation had changed and

was governed by new rules." *Id.* at 485. The trial court did not err in denying defendant's motion to suppress the statements he made at the police station after receiving *Miranda* warnings.

Defendant next asserts that imposing a sentence of 70 months for his second-degree robbery conviction was unconstitutionally cruel and unusual under the circumstances of this case.[3] Defendant argues that the sentence imposed in this case is unconstitutionally disproportionate because he was 17 years old when sentenced, he suffered from an undiagnosed mental disease, he had no criminal history, and he has returned to productivity and good behavior since he was diagnosed and received proper treatment. The state responds that the sentence does not violate the Oregon Constitution because it would not " 'shock the moral sense of all reasonable [people] as to what is right and proper under the circumstances.' " *State v. Rodriguez/Buck*, 347 Or 46, 57, 217 P3d 659 (2009) (quoting *Sustar v. County Court for Marion Co.*, 101 Or 657, 201 P 445 (1921)). Again, we agree with the state.

In *Rodriguez/Buck*, the Supreme Court considered three nonexclusive factors to determine whether the sentences were unconstitutionally disproportionate: "(1) a comparison of the severity of the penalty and the gravity of the crime; (2) a comparison of the penalties imposed for other, related crimes; and (3) the criminal history of the defendant." 347 Or at 58. Under the first factor, the court compared the "gravity" of the offenses the defendants committed with the severity of the penalties imposed. *Id.* at 59-63, 67-69. The offense includes both its statutory definition and the defendant's conduct in committing it. *Id.* at 69. Thus, "we consider the relationship between the penalty and offense to determine whether the penalty is proportional to the offense." *State v. Baker*, 233 Or App 536, 541, 226 P3d 125, *rev den*, 348 Or 414 (2010). Under the second factor, the court compared the penalty imposed with the penalties for related offenses; if penalties for more serious crimes result in less

---

[3] Under Article I, section 16, of the Oregon Constitution, "[c]ruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense."

severe sentences, "that is an indication that the challenged penalty may be disproportionate." *Rodriguez/Buck*, 347 Or at 63. Finally, under the third factor, the court considered the defendants' criminal histories, taking into account the fact that the defendants had no prior convictions. *Id.* at 77-78.

Applying the first *Rodriguez/Buck* factor, under ORS 137.700(2)(a)(R), robbery in the second degree has a mandatory minimum sentence of 70 months. A person commits robbery in the second degree by committing robbery in the third degree and the person "[r]epresents by word or conduct that the person is armed with what purports to be a dangerous or deadly weapon * * *." ORS 164.405(1)(a). Under ORS 164.395,

> "[a] person commits the crime of robbery in the third degree if in the course of committing or attempting to commit theft * * * the person uses or threatens the immediate use of physical force upon another person with the intent of:
>
> "(a)  Preventing or overcoming resistance to the taking of the property or to retention thereof immediately after the taking; or
>
> "(b)  Compelling the owner of such property or another person to deliver the property or to engage in other conduct which might aid in the commission of the theft * * *."

Thus, a person commits robbery in the second degree if that person represents that he or she is armed with a deadly weapon while committing or attempting to commit theft and threatens the use of force upon a person with the intent of preventing resistance to the taking of property.

Here, defendant walked into a store wearing a ski mask and holding a gun. Defendant pointed the gun at the employee and told her to put the money in the bag. The employee testified at trial that she was afraid for her safety. We conclude that, in weighing the "gravity" of the offense under its statutory definition and defendant's conduct in committing robbery in the second degree, a reasonable person's conscience would not be shocked by the 70-month penalty.

Applying the second factor, we look to penalties for crimes that are related to defendant's crime, to determine

whether a more serious related offense carries a less severe punishment. That is not the case here: under ORS 137.700(2)(a)(Q), the mandatory minimum sentence for robbery in the first degree is 90 months. Finally, under the third factor, we consider defendant's criminal history. Although defendant has no criminal history, "the lack of prior convictions alone has never been sufficient to render an otherwise constitutional penalty disproportionate * * *." *State v. Shaw*, 233 Or App 427, 439, 225 P3d 855, *rev den*, 348 Or 415 (2010). We conclude that imposing a 70-month sentence for the type of second-degree robbery that defendant committed would not shock the moral sense of a reasonable person.

Affirmed.