Argued and submitted March 26, 2014, reversed and remanded October 7, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LINDY D. HEISE-FAY,
*Defendant-Appellant.*

Josephine County Circuit Court
10CR0469; A150955

360 P3d 615

Stephanie J. Hortsch, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Michael Seung Moak Shin, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Erin C. Lagesen, Assistant Attorney General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Edmonds, Senior Judge.

ORTEGA, P. J.

**ORTEGA, P. J.**

Defendant challenges her convictions entered after a conditional guilty plea for hindering prosecution, unlawful delivery of marijuana, and two counts of endangering the welfare of a minor, assigning error to the trial court's denial of her motion to suppress. She contends that law enforcement officers failed to give her *Miranda* warnings under compelling circumstances, and that the court should have suppressed her incriminating statements and evidence discovered after the circumstances became compelling.[1] We agree with defendant, and reverse and remand.

We state the facts consistently with the trial court's factual findings that are supported by sufficient evidence in the record and its decision denying defendant's motion to suppress. *State v. Shaff*, 343 Or 639, 641, 175 P3d 454 (2007). A Department of Human Services (DHS) employee contacted Calvert, the parole and probation officer for Daly, to inform him that Daly was possibly at defendant's house in rural Josephine County. Daly was wanted for absconding from supervision for drug-related convictions. The DHS employee also passed on information concerning a possible drug operation and the presence of children at the residence.

Accordingly, Calvert, Parole Officer Scaglione, Detective Myers, Detective Snyder, Sergeant Johnson, a Josephine County Sheriff's Office K-9 Deputy (with his police dog), and two DHS child welfare workers visited the house in three unmarked vehicles and one Josephine County Sheriff's Office vehicle. Myers, Scaglione, and the K-9 Deputy parked their vehicle in a neighbor's driveway (out of sight of defendant's house) and approached the back of the house from the neighbor's property. The rest of the officers parked their vehicles in defendant's driveway, and Calvert and Snyder, each dressed in civilian clothes with badges, handcuffs, and holstered guns visible, approached the front door.

---

[1] Judge Thomas M. Hull presided over the suppression hearing, issued a letter opinion, and entered the order denying defendant's motion to suppress. Judge Lindi L. Baker entered the judgment of conviction resulting from defendant's subsequent conditional guilty plea.

Defendant answered the door. Calvert introduced himself and informed defendant that they were looking for Daly and had received information that he was at the house, that "there were some children there," and that "there was possible illegal marijuana activities going on there." Defendant told Calvert that Daly had "gone fishing with a friend and that he was not home." When pressed, defendant gave conflicting information about when and with whom Daly had left, and appeared "dishonest" to Calvert. Calvert and the deputy continued to question defendant. Meanwhile, the officers in the back of the house spotted Daly hiding behind a woodshed and apprehended him. Myers questioned Daly, who indicated that he had been fixing breakfast in the kitchen of the house when they arrived. Calvert heard an officer exclaim from the back of the house that Daly was in custody and walked to the back of the house where he observed Daly in handcuffs. Snyder remained at the front door with defendant.

Calvert informed Myers that defendant had told him that Daly was not at the house and that she had appeared to be lying. By that time, Snyder and defendant had also walked to the back of the house. Myers asked defendant if she "would be willing to step around to the front of the residence" and speak to him. Defendant assented. Once in the front, Myers asked defendant a series of questions: Who was at the house when police arrived? Where was defendant when the police arrived? Where was Daly when the police arrived? Did defendant know that Daly had warrants for his arrest? Although defendant's answers to those questions are not apparent in the record, defendant did inform Myers that she did not know that Daly was at the house. Myers responded that he knew that defendant was lying because Daly had told Myers that he was at the house when they arrived. Myers later testified at the suppression hearing that

> "I advised her that I believed that she was lying to me because I had already spoken to * * * Daly, and I advised her that I had no intentions of taking her into custody. She could be in trouble for hindering prosecution, but I had no

intentions of taking her into custody if she was honest and cooperative."[2]

Defendant then admitted that she had known that Daly was at the house.

Myers asked defendant if she had a medical marijuana "grow" on her property, and she answered that she did. She indicated that she was growing 12 plants—six for herself and six for a patient. Defendant offered to show Myers the grow site, which was across the driveway from the house and partially obstructed. Myers observed 12 mature plants and 3 immature plants. Myers and defendant discussed the legality of the marijuana grow, including whether there was additional marijuana on the property. Defendant indicated that she had two mature plants in the house and two or three ounces of marijuana. Myers again

"assured her that I had no intentions of taking her to jail. I even asked her that if she was going to continue to be honest and cooperative, and she assured me that she would. And I asked her if she was going to be willing to consent to a search of the residence, and she stated that she would."

Myers asked defendant about paperwork documenting the marijuana grow, and defendant invited Myers into the home to view the documentation. Defendant, however, failed to produce paperwork that would authorize all of the plants observed by Myers. Myers left the house to call the Oregon Medical Marijuana Program on his mobile phone to verify the quantity that defendant was authorized to grow. Once outside the house, Myers asked Snyder to ask defendant to sign a written consent to search form.

Snyder presented defendant with a consent to search form that also had the *Miranda* warnings printed on the back. Defendant read the front and back, and signed the consent to search form. Snyder then began searching

---

[2] Myers also testified in more ambiguous terms that he "told her emphatically that I had no intentions of taking her into custody" without mentioning the qualifier that she be "honest and cooperative." To the extent that there is a factual dispute as to what Myers actually told defendant, the trial court resolved that dispute and found that Myers "advised [defendant] that if she were to be truthful and cooperative that he would not arrest her despite her engaging in a crime in his presence."

the house with Johnson. The officers found additional marijuana plants and evidence indicative of drug sales. At some point after the officers had begun searching the house and had observed incriminating evidence, Johnson orally gave defendant *Miranda* warnings. She indicated that she understood the warnings. The officers continued searching, and defendant admitted to Myers that she had sold marijuana. The officers collected evidence, cited defendant, and left more than two hours after they had arrived. Throughout the encounter, the officers were calm and cordial with defendant.

Defendant was charged with crimes related to the unlawful manufacture, delivery, and possession of marijuana, hindering prosecution, child neglect, and endangering the welfare of a minor. After the trial court denied her motion to suppress, she entered a conditional guilty plea to charges of hindering prosecution, unlawful delivery of marijuana, and two counts of endangering the welfare of a minor. She appeals the resulting judgment, assigning error to the denial of her motion to suppress and arguing that the officers violated Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution. We review the trial court's denial of a motion to suppress for legal error. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993).

We begin with the state constitutional issue. *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) ("The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim."). Article I, section 12, provides, in part, that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." To protect a person's right against compelled self-incrimination under the Oregon Constitution, *Miranda* warnings must be given before questioning when a person is in "full custody" or in "circumstances that create a setting which judges would and officers should recognize to be compelling." *Shaff*, 343 Or at 645 (internal quotation marks omitted).

Whether defendant was in compelling circumstances turns on "how a reasonable person in [her] position would

have understood * * * her situation." *Id.* "A suspect is placed in 'compelling circumstances' when a 'reasonable person in the suspect's position would have felt compelled to answer a police officer's questions.'" *State v. Schwerbel*, 233 Or App 391, 395, 226 P3d 100 (2010) (quoting *State v. Bush*, 203 Or App 605, 610, 126 P3d 705 (2006)). That inquiry requires us to consider the totality of the circumstances, and the "over-arching inquiry is whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *State v. Roble-Baker*, 340 Or 631, 641, 136 P3d 22 (2006). The nonexclusive factors we consider to make that determination include (1) the location of the encounter; (2) the length of the encounter; (3) the amount of pressure exerted on the defendant, including whether an officer has used evidence of guilt in a coercive manner; and (4) the defendant's ability to terminate the encounter. *Id.* at 640-41. We also examine the number of officers and police cars at the scene, the demeanor of the investigating officer, and the use of physical force or confinement during questioning. *Schwerbel*, 233 Or App at 395.

Defendant asserts that her interaction with Myers placed her in compelling circumstances no later than the moment when Myers and defendant walked to the front of the residence, after Daly had been taken into custody, and Myers informed defendant that he believed that she was lying to him, that she could be in trouble for hindering prosecution, and that he had no intention of taking her into custody if she were honest and cooperative. She asserts that, under the totality of the circumstances, a suspect in her position would have felt compelled to answer Myers's questions. She acknowledges that the tone of the encounter—calm and casual—and the fact that the officers neither used force nor confined her during the questioning tends to weigh against a conclusion that the circumstances were compelling. However, she asserts that the rest of the relevant facts, taken together, demonstrate that she was, in fact, in compelling circumstances.

We examine each factor before evaluating the totality of the circumstances to determine whether the officers created the sort of police-dominated atmosphere that

*Miranda* warnings were intended to counteract. Except in the most extreme case, no single factor is dispositive. *State v. Northcutt*, 246 Or App 239, 246, 268 P3d 154 (2011). We begin with the location of the encounter and the number of police officers and vehicles at the scene.

We are mindful that, when an interview occurs in familiar surroundings, like defendant's residence in this case, that setting tends to "diminish[] the police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Shaff*, 343 Or at 646. Nevertheless, we agree with defendant that, when a person's home becomes the location of a significant police operation, that police presence can at least tend to establish a police-dominated atmosphere in otherwise "familiar surroundings." Here, the arrest of Daly brought a significant police presence to defendant's residence, consisting of three police officers, two parole officers, one K-9 deputy and his police dog, and two DHS workers. They arrived in four vehicles, three of which the officers parked in defendant's driveway. They had "triangulated" the house and, although they were dressed in civilian clothes, the law enforcement officers had badges and guns that were visible to defendant. Upon first contacting defendant, Calvert informed her that they were there for Daly and that they had information about "illegal marijuana activities" and that children were present. On the other hand, as noted, throughout the encounter, the police were calm and cordial to defendant, and they asserted no physical force or confinement during questioning. Myers did not direct defendant anywhere, but instead asked if she "would be willing" to accompany him to the front of the house. The officers never told her that she was not free to go, and they generally allowed her to move freely around the property during the encounter.

Standing alone, the location, the police presence, and the tone of the encounter do not establish compelling circumstances, but they do, to some extent, counteract the general assumption that circumstances are less compelling because the encounter occurred at defendant's home.

Given that defendant claims that the circumstances became compelling in the first 15 minutes or so of the

encounter (*i.e.*, Daly was apprehended within 10 minutes of the officers' arrival and Myers's conversation with defendant at the front of the house occurred shortly thereafter), the length of the encounter favors the state's assertion that the circumstances were not compelling. Although, in total, officers were at the residence for over two hours, this is not a situation where prolonged questioning or confinement is at issue.

Ultimately, this case turns on the amount of pressure exerted on defendant and whether that pressure, in connection with the other circumstances already noted, compelled defendant's cooperation. In particular, we focus on the point at which Myers told defendant that he knew that she had lied about Daly's whereabouts, that she could be in trouble for hindering prosecution in doing so, and that he had no intention of arresting her *if* she was honest and cooperative. Defendant asserts that she believed, and any reasonable person in her situation would have believed, that she would be arrested *unless* she cooperated with Myers.[3] The state maintains that Myers was not confronting her with evidence of a crime in a coercive manner; he was simply warning her that lying under the circumstances could be a crime in and of itself.

Generally, stopping a person to investigate a crime does not result in compelling circumstances. *State v. Nevel*, 126 Or App 270, 276, 868 P2d 1338 (1994). Further, questions that merely suggest that an officer is concerned about possible "illegal activity" do not usually create compelling

---

[3] The trial court, in its letter opinion, explained:

"The court thereby concludes that defendant was not coerced by detective Myers's statement regarding her honesty, cooperation, and jail. She clearly was making a conscious decision how and when to cooperate with officers, presumably based upon what she believed was to her best benefit. This is not somebody who is coerced by the police, in the *Miranda*, and motion to suppress setting."

We understand the trial court to have concluded, at least in part, that defendant subjectively did not cooperate as a result of Myers's statements "regarding her honesty, cooperation, and jail." To the extent the court applied a subjective test, it applied the wrong legal test. "The question whether the circumstances were compelling does not turn on either the officer's or the suspect's subjective belief or intent; rather it turns on how a reasonable person in the suspect's position would have understood his or her situation." *Shaff*, 343 Or at 645.

circumstances. *State v. Stone*, 269 Or App 745, 751, 346 P3d 595 (2015). However, expressly confronting a suspect with evidence of probable cause to arrest may make the circumstances sufficiently compelling to require *Miranda* warnings. *State v. McMillan*, 184 Or App 63, 68, 55 P3d 537 (2002). "[W]hat matters is not whether evidence of guilt was apparent to the suspect; rather it is whether the officers used that evidence in a coercive manner." *Shaff*, 343 Or at 650.

We examine two cases that are particularly illustrative of that concept. In *Schwerbel*, a police officer, after stopping the defendant and discovering that his driver's license was suspended, ordered the defendant to exit the car and told him that he "'was going to be detained, as it was a crime for [the defendant] to drive.'" 233 Or App at 393. The officer then asked the defendant "'if there was anything on [his] person or in [his] vehicle that [the officer] needed to be aware of.'" *Id.* The defendant responded with an incriminating statement. On appeal, we concluded that the officer's statements exerted a significant amount of pressure on the defendant because "it notified [him] that [the officer] knew that it was a crime for [him] to drive, that [the officer] had gathered enough evidence to arrest [him] for the crime of driving while suspended, and that [the officer] intended to detain—and could arrest—[him] for that crime." *Id.* at 397-98. We determined that the defendant was in compelling circumstances because a reasonable person in his position—"knowing that he was being detained by [the officer] for committing a crime and that it was within [the officer's] discretion to arrest him and take him to jail or to cite and release him—would feel compelled to cooperate with [the officer] by answering his question." *Id.* at 398.

Similarly, in *McMillan*, two police officers pulled over the male defendant and a woman on suspicion of prostitution. 184 Or App at 65. The officers split up the defendant and the woman, and the defendant asked an officer, "'[W]hat's going to happen, am I going to jail?'" *Id.* at 66 (brackets in original). The officer told him that, "'as soon as [the other officer] is finished with the prostitute, then he's going to come back and make the decision as to whether or not you're going to jail or getting a citation or what we're

going to do with this particular case.'" *Id.* The officer then confronted the defendant with the woman's statement that the defendant had agreed to sex for money. In response, the defendant made incriminating statements.

We concluded that the officers had placed the defendant in compelling circumstances. After recognizing that the interaction contained many of the hallmarks of a routine traffic stop, we noted that "[w]hat tips the balance" is that the officers had created a situation in which the defendant reasonably understood that the officers could exert control over him, that they had probable cause to arrest him, and that one of the officers would be deciding whether the defendant should be arrested and taken to jail. *Id.* at 68-69. In so holding, we emphasized that the officers had confronted the defendant with evidence of sufficient probable cause to support an immediate arrest and that, in doing so, they created circumstances sufficiently compelling to require *Miranda* warnings. *Id.* at 70; *see also State v. Werowinski*, 179 Or App 522, 532, 40 P3d 545 (2002) (compelling circumstances existed when a police officer confronted the defendant, who was seated in the back of a police car with the door open, with eyewitness statements that implicated him in the crime of assault); *State v. Rose*, 109 Or App 378, 381, 819 P2d 757 (1991) (confronting the defendant with sufficient probable cause to support an immediate arrest, along with restrictions in movement, created compelling circumstances).

In both cases, the defendant had been placed in compelling circumstances because "the officers had communicated that they believed that each defendant had committed a crime, that they had probable cause to arrest, and that they intended to make an arrest or were strongly weighing the possibility of making an arrest." *Stone*, 269 Or App at 753 (distilling analysis in *Schwerbel* and *McMillan*). That contrasts significantly with other cases where compelling circumstances did not exist when an officer had asked open-ended questions during an investigation that were neither coercive nor based on an assumption of the defendant's guilt. *See, e.g., id.* (a single open-ended question that suggested that the officer suspected the defendant might be in possession of an unlawful item is neither coercive nor based on an assumption of the defendant's guilt).

Myers's statement to defendant that he had no intention of arresting her if she was honest and cooperative is less direct than the statements at issue in *Schwerbel* and *McMillan* (where the officers more directly confronted the defendants with evidence of probable cause to arrest). Nevertheless, we conclude that Myers's statements conveyed to defendant, and would have conveyed to a reasonable person, that, if she was not "honest and cooperative," she was subject to arrest for hindering prosecution. After Daly had been apprehended, Myers asked defendant a series of questions about "what happened when [the officers first] arrived" and defendant told him that she did not know that Daly had been at the residence. Myers then indicated to defendant that he knew she was lying to him based on his conversation with Daly and that she could be in trouble for hindering prosecution. Once Myers confronted defendant with evidence that she had committed a crime, his statement that he had no intention of taking her into custody if she was honest and cooperative would have indicated to a reasonable person that it was within his discretion to arrest her and that he was strongly considering doing so, *unless* she was honest and cooperative. Given the direct implication in Myers's statement that defendant would be arrested if she was not "honest and cooperative," the encounter took on coercive overtones at that point. Accordingly, this is not a case where the officers merely confronted defendant with evidence of guilt "briefly and noncoercively." *See Shaff*, 343 Or at 646-47 (brief detention in a home and noncoercive interrogation); *State v. Saunders*, 221 Or App 116, 188 P3d 449, *rev den*, 345 Or 416 (2008) (circumstances not compelling when confronting the defendant with incriminating evidence in noncoercive manner).

The presence of the DHS workers is an additional circumstance that adds to the coercive implications of Myers's statement. Calvert, upon first confronting defendant, informed her that they were at the house because they had received information that Daly was there, that "there were some children there," and that "there was possible illegal marijuana activities going on there." Accordingly, he put defendant on notice that DHS was present because of concern for her children. Although the trial court found

that defendant was advised that DHS "would not take her children," as defendant points out, there is no evidence in the record to support that finding. The DHS workers did not testify at the suppression hearing, and no officer testified to any facts that would support such a finding or allow such an inference. The only evidence presented by the state was that, over the course of the encounter, DHS workers had several conversations with defendant. The substance of those conversations is not in the record. Defendant, on the other hand, testified that immediately before she signed the consent to search form, one of the DHS workers told her that she needed to cooperate with the police. Given the state of the record, there is no evidence from which a factfinder could reasonably infer that the DHS workers informed defendant that they would not take her children. Rather, a reasonable person in defendant's situation would have been concerned that, if she was not "honest and cooperative" and was arrested, DHS would take her children into protective custody.

In sum, the coercive nature of Myers's statement, in the context of significant police activity on defendant's property and in the presence of DHS workers, exerted a significant amount of pressure on defendant so that a reasonable person in her situation would have felt compelled to be "honest and cooperative" with the officers. Thus, the officers violated Article I, section 12, by questioning defendant in compelling circumstances without giving her *Miranda* warnings.

Given the constitutional violation, we must address what evidence obtained after that violation should have been suppressed by the trial court. The state suggests that, even if a *Miranda* violation occurred, all physical and testimonial evidence obtained after defendant consented to a search of the residence should not be suppressed because there is no evidence that defendant's consent was "derived from" any *Miranda* violation.

When an officer obtains evidence in violation of Article I, section 12, the court suppresses "not only statements that a suspect makes in direct response to unwarned questioning but also evidence that derives from or is a

product of that constitutional violation." *State v. Jarnagin,* 351 Or 703, 713, 277 P3d 535 (2012). To determine whether physical evidence "derives from or is a product of" the violation, we examine the totality of the circumstances, including

> "the nature of the violation, the amount of time between the violation and any later statements, whether the suspect remained in custody before making any later statements, subsequent events that may have dissipated the taint of the earlier violation, and the use that the state has made of the unwarned statements."

*Id.* at 716. Here, the state argues that the record does not demonstrate that the officers used defendant's un*Mirandized* statements to convince her to consent to the search, and that defendant's signature on the consent to search form dissipated the taint of the earlier violation because it demonstrated that her consent "derived from" her informed and voluntary decision to authorize the search.[4]

We agree with defendant that physical and testimonial evidence discovered by the police after defendant signed the consent form "derives from or is a product of" the *Miranda* violation that was ongoing at the time Snyder presented her with the form. At that time, defendant remained without *Miranda* warnings in an ongoing and significant police operation on her property. *See id.* at 717-18 (noting that "a change in time and circumstances can be sufficient to dissipate the effects of an earlier *Miranda* violation"). Defendant was in compelling circumstances within 15 minutes of the police arriving at her front door, and she remained in compelling circumstances at the time the police obtained her consent to search. *See State v. Koch,* 267 Or App 322, 333, 341 P3d 112 (2014) (where the defendant was in compelling circumstances within 15 minutes of the initial encounter and under arrest when he consented to a urine sample, the circumstances militated in favor of suppression). And most importantly, defendant's consent to search—both oral and written—was tainted by Myers's use of the specter

---

[4] The back of the written consent to search form had *Miranda* warnings. Although it is not entirely clear, we do not understand the state to argue specifically that defendant's reading of the *Miranda* warnings served to dissipate the taint of the constitutional violation. Even if the state is making that argument, we reject it.

of arrest to gain her cooperation. That is, after defendant showed Myers the marijuana grow site, he

> "assured her that I had no intentions of taking her to jail. I even asked her \* \* \* if she was going to continue to be honest and cooperative, and she assured me that she would. And I asked her if she was going to be willing to consent to a search of the residence, and she stated that she would."

Accordingly, Myers revisited his coercive approach from earlier in the encounter and, in the circumstances, his statements would have suggested to a reasonable person that he would not take defendant to jail *if* she was honest and cooperative—implying that her cooperation included consenting to the search of the residence.

And, given the implication in Myers's statements, this is not a case where defendant's signature on the consent form equals a "voluntary" decision to authorize a search, which in certain circumstances, can attenuate the taint of the *Miranda* violation. Accordingly, the Supreme Court's most recent authority on this subject, *State v. Delong*, 357 Or 365, 350 P3d 433 (2015), is inapposite. In *Delong*, an officer violated the defendant's Article I, section 12, rights when, after placing the defendant in handcuffs in the rear of the police car, he asked the defendant "'if there was anything we should be concerned about' in his car," and the defendant "'told [him] "no," and that if [the officers] wanted to search the vehicle [they] could.'" 357 Or at 368. The court concluded that the officer's question was open-ended and benign, and that, essentially, the defendant had made an independent decision to invite the police to search his car if they wanted to. *Id.* at 379. Because of that, and because the defendant was not "actually coerced" by the police, the court concluded that the defendant's invitation to search his car had attenuated the taint flowing from the officer's unwarned question. *Id.* at 380. Given the significantly different circumstances in *Delong*, we conclude that it does not affect our decision in this case.

In the totality of the circumstances, we conclude that the evidence acquired after defendant consented to the search "derives from or is a product of" the constitutional violation that occurred in this case.

Finally, we address the state's argument that the statements made by defendant after Johnson belatedly gave her *Miranda* warnings were admissible because Johnson's warnings were effective to inform her of her rights and to permit her to make an informed decision about whether to speak to the officers. As far as we can tell, the only evidence that is put at issue by the belated *Miranda* warnings is defendant's statements admitting to the sale of marijuana.

When, after conducting an initial, unwarned custodial interrogation, the police give the required warnings and the defendant makes further incriminating statements, a trial court must exclude the defendant's post-*Miranda* statements unless the state establishes that, considering the totality of the circumstances, when the police belatedly administer *Miranda* warnings, "they effectively and accurately informed the defendant of his or her Article I, section 12, rights." *State v. Vondehn*, 348 Or 462, 467, 236 P3d 691 (2010). That is, in light of the previous unwarned questioning, the issue is whether the belated *Miranda* warnings were sufficient to ensure that the defendant's decision to waive her right against self-incrimination was knowing and voluntary. *Id.* at 485. We must make that determination because, "when the police question first and warn later, their exhibition and exercise of authority and violation of the defendant's constitutional rights may communicate to a defendant * * * that, before the defendant will be released, he or she must answer the questions asked." *Id.* at 481. To make that determination, we consider all the relevant circumstances, including

"(1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and second rounds of interrogation, (4) the continuity of police personnel, (5) the degree to which the interrogator's questions treated the second round as continuous with the first, and (6) whether the police cautioned that the earlier unwarned statement could not be used in any subsequent prosecution."

*Id.* at 479.

Here, the questions and answers in the "first round of interrogation" were detailed and probing. Myers asked questions regarding the existence of a marijuana grow and, once he determined its existence, probed the legality of the grow. Further, throughout the encounter, Myers was essentially the only officer questioning defendant and, although there were several breaks in contact between him and defendant, Myers's first and second rounds of questioning occurred during a continuous and fluid police operation. Accordingly, this is more like a case where the two phases of questioning blended into a "continuum" rather than a case where there was a substantial break in time between episodes of questioning. *See Missouri v. Seibert*, 542 US 600, 622, 124 S Ct 2601, 159 L Ed 2d 643 (2004) (plurality opinion) (noting that a substantial break in time between the prewarning statements and the *Miranda* warnings may suffice to render belated warnings effective "in most circumstances, as it allows the accused to distinguish between the two contexts and appreciate that the interrogation has taken a new turn"). It is also notable that Johnson, and not Myers, was the officer who gave defendant *Miranda* warnings and that, in doing so, there is no evidence that he cautioned her that her earlier unwarned statements could not be used in any subsequent prosecution.

Given the totality of the circumstances, we cannot conclude that the state established that the belatedly administered *Miranda* warnings were sufficient to ensure that defendant's decision to waive her right against self-incrimination was knowing and voluntary.

Reversed and remanded.