EGAN, C. J.
*195 Defendant appeals a judgment of conviction for delivery and possession of methamphetamine, ORS 475.890 ; ORS 475.894, assigning error to the trial court's denial of his motion to suppress statements he made after a deputy belatedly read him Miranda warnings. The state concedes that defendant's pre-Miranda statement was inadmissible but contends that the belated Miranda warnings were effective and rendered all subsequent statements admissible. Defendant argues that all of the questioning occurred during a single encounter fraught with coercion. Since the statements went to one of the central factual issues-whether defendant delivered methamphetamine-defendant argues that we must reverse his conviction for delivery of methamphetamine, ORS 475.890.[1] We agree with defendant, and thus, we reverse and remand that conviction; otherwise, we affirm.
In reviewing the denial of a motion to suppress, we are bound by the trial court's factual findings if constitutionally sufficient evidence in the record supports them. State v. Ehly , 317 Or. 66, 74-75, 854 P.2d 421 (1993). We review the ultimate legal conclusions based on those findings for legal error. Id. at 75, 854 P.2d 421. "[I]f the trial court did not make findings on all pertinent historical facts and there is evidence from which those facts could be decided more than one way, we will presume that the trial court found facts in a manner consistent with its ultimate conclusion." State v. Stevens , 311 Or. 119, 127, 806 P.2d 92 (1991). We state the facts consistently with that standard.
While Deputy Reavis was on patrol, the Reedsport Police Department told him that an anonymous caller had reported that defendant was en route to purchase *196 methamphetamine from two known drug dealers. Reavis saw defendant's car, and he began to follow it. Eventually, Reavis observed *237 defendant fail to properly signal prior to making a turn, so Reavis called Deputy Pitcher to assist him in stopping defendant for that traffic violation.
Reavis and Pitcher approached defendant's car together, with Reavis on the driver side and Pitcher on the passenger side. While Reavis explained the reason for the stop and asked defendant for his license, insurance, and registration, Pitcher looked in the passenger side window. On the passenger seat, he saw a plastic "sandwich" bag sticking out of a pocket of a pair of pants in a laundry hamper. The bag contained a white substance. Pitcher looked over the top of the car and told Reavis what he saw. Reavis asked defendant what was in the bag, and defendant responded by asking "What?" Pitcher pointed at the bag. Defendant placed his hand in the pocket of the pants in the hamper, pushed the bag deeper into the pocket, and then pushed the entire pair of pants down towards the bottom of the hamper. Defendant then asked, "What bag?"
Reavis told defendant to step out of his vehicle. When defendant asked why, Reavis pointed his taser at defendant and again told him to get out of the car. Defendant said, "[O]kay, okay, don't shoot me," and Reavis told defendant "to cooperate and I won't." Defendant got out of the vehicle. Reavis told him to place his hands behind his back and then handcuffed him. Around the same time, Pitcher came around to the driver's side of the vehicle and asked defendant again what was in the bag. Defendant "told him that it was pills." At that point, Reavis gave defendant Miranda warnings and told him that he was "just being detained." Defendant said he understood the Miranda warnings.
Reavis then asked defendant again what was in the bag. Defendant said "some pills, Tramadol and some others." Pitcher asked defendant about prescriptions for the pills, and defendant said that "none of the prescriptions he gets are strong enough." To Reavis, that indicated that the pills in the bag were not prescribed to defendant. Defendant then "started pleading" with the deputies and offered to work with them. Reavis told defendant that they first needed to *197 "deal with him and what * * * he's got going on with him." Reavis asked if there was anything else illegal in the car. Defendant said there was some "white dope in the pocket with the pills" and also that there was "white dope" in the pocket of the pants he was wearing. Reavis asked if there were any needles or knives in the car, and defendant said no. Reavis asked defendant when he had last used, and defendant said, "about two days ago." Reavis asked where defendant's pipe was, and defendant gestured to a yellow flashlight lying by the driver's seat. Defendant told Reavis that he could remove "the meth" from his pockets and the car, and that Reavis could retrieve the pipe. Ultimately, Reavis found several small bags, each containing methamphetamine, as well as a methamphetamine pipe and $ 3,360 in cash. After Reavis found those items, defendant told Reavis that, in the past two weeks, he had been both buying and selling methamphetamine.
Defendant moved to suppress all of his statements and the evidence obtained during the stop, making several arguments, including that the deputies unlawfully interrogated him in compelling circumstances before giving him Miranda warnings, thus violating his rights under Article I, section 12, of the Oregon Constitution. Defendant further argued that the "belated" Miranda warnings did not permit admission of the statements he made after those warnings were given. The state responded that the statements were admissible because the deputies' delay in giving the Miranda warnings was accidental and because the deputies did not "trade" on the information they obtained pre-Miranda . The court denied defendant's motion to suppress, noting that prior to the Miranda warnings being given, the officers were still "sorting things out." After a bench trial where the parties stipulated to the testimony from the motion to suppress hearing and police and laboratory reports identifying the substance in the plastic bags, the court found defendant guilty on both charges.
On appeal, defendant assigns error to the trial court's ruling on the motion to suppress, focusing solely on what defendant characterizes as the "belated" Miranda warnings. The state concedes that, when the *238 deputies ordered defendant *198 out of his vehicle at taser point and asked what was in the bag, defendant was in compelling circumstances. In other words, it is undisputed on appeal that Pitcher violated defendant's Article I, section 12, rights when he asked defendant what was in the bag before giving him Miranda warnings. The state further concedes that, because the deputies failed to give defendant Miranda warnings prior to asking about the bag, defendant's first statement that the bag contained "pills" was inadmissible. We agree and accept the state's concessions; thus, the sole disputed issue in this case is whether the trial court erred in admitting the statements defendant made after he was given belated Miranda warnings.
Article I, section 12,[2] grants individuals a constitutional right to remain silent. State v. Vondehn , 348 Or. 462, 474, 236 P.3d 691 (2010). Individuals may, of course, choose to waive that right. Id. However, because "a custodial interrogation is inherently compelling," Article I, section 12, requires that police inform an individual subject to custodial interrogation "that he or she has a right to remain silent and to consult with counsel and that any statements that the person makes may be used against the person in a criminal prosecution." Id. If police initially fail to inform a defendant of those rights, but then later correct themselves and give the warnings, any post-Miranda statements are only admissible if the state establishes that the police "effectively and accurately informed the defendant of his or her Article I, section 12, rights." State v. Heise-Fay , 274 Or. App. 196, 211, 360 P.3d 615 (2015). When police "question first and warn later, their exhibition and exercise of authority and violation of the defendant's constitutional rights" may communicate to a defendant that he or she has no real choice to remain silent. Vondehn , 348 Or. at 481, 236 P.3d 691. In that situation, the police have effectively conveyed conflicting messages. Id. Therefore, "we cannot assume that the mere recitation" of Miranda warnings after such exercise of authority is sufficient to serve the "intended informative function." Id.
To determine whether belated Miranda warnings were effective, we consider "all relevant circumstances,"
*199 and turn to a nonexhaustive list of factors first outlined in Missouri v. Seibert , 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). See, e.g. , State v. Jarnagin , 351 Or. 703, 719-20, 277 P.3d 535 (2012) ; Vondehn , 348 Or. at 482, 236 P.3d 691. Those factors are:
"(1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements [given by the suspect], (3) the timing and setting of the first and the second rounds of interrogation, (4) the continuity of police personnel, (5) the degree to which the interrogator's questions treated the second round of interrogation as continuous with the first, and (6) whether the police cautioned that the earlier unwarned statement could not be used in any subsequent prosecution."
Vondehn , 348 Or. at 479, 236 P.3d 691. We also consider whether a defendant was subject to "additional coercion"-that is, coercion in addition to being in the inherently compelling circumstance of a custodial interrogation. See id. at 486, 236 P.3d 691. In essence, we focus "on the objective message that the police actually convey by the techniques that they use and the warnings that they give." Id. at 483, 236 P.3d 691.
We analyze the above factors keeping in mind "the context" of the two Supreme Court cases from which they originated: Siebert and Oregon v. Elstad , 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Jarnagin , 351 Or. at 719-22, 277 P.3d 535. In Seibert , officers used a "technique" wherein they would interrogate a defendant with no advice of rights, and then follow that interrogation up by giving Miranda warnings and prompting the defendant to repeat what he or she had just admitted. Jarnagin , 351 Or. at 721, 277 P.3d 535. In Siebert , the plurality was concerned that defendants had no "real choice about giving an admissible statement because *239 the unwarned and warned interrogations blended into one continuum." Jarnagin , 351 Or. at 721, 277 P.3d 535 (internal brackets and quotation marks omitted). At the same time, in Siebert , the court reaffirmed its earlier reasoning that belated warnings were effective in Elstad , because the warned questioning there "presented a markedly different experience from the unwarned questioning." Jarnagin , 351 Or. at 721-22, 277 P.3d 535 (internal quotation marks and brackets omitted). Indeed, in Elstad , *200 officers did not use a "question first, warn later" technique. Rather, after eliciting an un-Mirandized confession at the defendant's house, the officers brought the defendant to the sheriff's headquarters, waited for an hour, Mirandized the defendant, and only then began to ask him more questions. Elstad , 470 U.S. at 301, 105 S.Ct. 1285. Thus, Vondehn and Elstad present bookends for when belated Miranda warnings will and will not suffice: on the one end, the unwarned and warned interrogations "blend[ ] into one continuum," and at the other, they present "markedly different experience[s]." Jarnagin , 351 Or. at 721-22, 277 P.3d 535.
As Seibert is "at one end of the range of the factual circumstances" and " Elstad is at the other," we find it helpful to briefly examine other cases in which Oregon courts have applied the multi-factor test to determine the admissibility of post-Miranda statements. Vondehn , 348 Or. at 481, 236 P.3d 691. In Vondehn , the Supreme Court ultimately concluded that the belated Miranda warnings "accurately and effectively communicated that [the] defendant had, from that time forth, a right to remain silent." 348 Or. at 486, 236 P.3d 691. In that case, the defendant was a passenger in a car which police officers stopped to investigate a traffic violation and possible driving under the influence of intoxicants. The police arrested the defendant on a warrant, handcuffed him, and placed him in the back seat of a patrol car. Before giving the defendant Miranda warnings, an officer asked the defendant if he was the owner of a backpack found in the car and whether the backpack contained marijuana. The defendant said yes to both questions and consented to a search of the backpack. At that point, the officer left for about five minutes and consulted with another officer before he returned, Mirandized the defendant, and continued to ask more questions. Four factors led the court to its decision that the belated warning was effective. First, the sets of questions were markedly different: the first set was "routine in nature and consumed less than a minute in time" whereas the second set was "more detailed and probing." Id. at 485, 236 P.3d 691. Second, there was a five-minute break after the short, less than one-minute-long initial set of questions. Id. at 485-86, 236 P.3d 691. Third, though officers did not caution the defendant that his earlier statement could not be used against him, neither did they indicate that the *201 defendant had given them any incriminating information. Id. at 486, 236 P.3d 691. Finally, though the defendant was under arrest and handcuffed when questioned, he was not subjected to any additional coercion. Id.
We reached the opposite conclusion in Heise-Fay , 274 Or. App. at 212, 360 P.3d 615. There, several officers went to the defendant's house seeking a suspect and intending to investigate a possible drug operation and the presence of children at the residence. One officer, Calvert, spoke with the defendant at her front door and asked her about the suspect. Shortly thereafter, another officer, Myers, spoke to the defendant, confronting her with the fact that the suspect was spotted hiding behind a woodshed on the property. Myers then asked the defendant about a marijuana grow on her property. After the defendant failed to produce paperwork authorizing all of the plants that Myers had seen, another officer, Snyder, presented the defendant with a form that contained Miranda warnings, and yet another officer, Johnson, gave the defendant oral warnings. Shortly thereafter, the defendant confessed to Myers that she had sold marijuana illegally. Three factors led us to conclude that Heise-Fay was a case where the two phases of questioning blended into a continuum. Id. at 212, 360 P.3d 615. First, the questions and answers in the first set of questions were detailed and probing. Second, the same officer conducted nearly all of the questioning, and though there were several breaks in contact, the two rounds of questioning "occurred *240 during a continuous and fluid police operation." Id. Finally, there was no evidence that officers cautioned the defendant that her earlier unwarned statements could not be used against her. Id. Additionally, it was "notable" that a different officer gave the Miranda warnings than the one who had done the earlier questioning. Id.
Jarnagin and State v. Bielskies , 241 Or. App. 17, 249 P.3d 144, rev. den. , 350 Or. 530, 257 P.3d 1020 (2011), are also instructive. In Jarnagin , the Supreme Court found belated warnings effective based primarily on three factors. 351 Or. at 723, 277 P.3d 535. First, two to three hours separated the two sets of questions-a "substantial" break in time. Id. Second, the central figure conducting the second set of questions was "someone new," and those questions involved a different type of examination. Id. Finally, the defendant had volunteered *202 that he understood the rights that he was informed of, stating that "I can, at any time, decide that I would like a lawyer or not answer any further questions." Id. at 723-24, 277 P.3d 535. Similarly, in Bielskies , we relied primarily on four factors to conclude that belated warnings were effective. 241 Or. App. at 25, 249 P.3d 144. First, the two rounds of questioning were different because they focused on different subjects. Id. Second, there was a break between the two sets of questions that was at least as long as it took to identify pills seized from defendant and begin moving him from the police precinct to the jail. Id. Third, an officer cautioned the defendant that his unwarned statements could not be used against him. Id. Finally, there was no evidence that the defendant was subjected to "additional coercion." Id.
Here, defendant concedes that the first Seibert factor-that is, the completeness and detail of the questions and answers in the first round of interrogation-weighs in favor of the belated warnings being effective, but he argues that the remaining factors weigh in favor of suppression. Furthermore, defendant argues that the deputies subjected him to "significant coercion" both before and after the Miranda warnings. Specifically, defendant points to the facts that Reavis had threatened to taser him if he did not cooperate, placed him in handcuffs, and told him that he was being "detained."
The state responds that we should first analyze this case keeping in mind that here, "the danger of rendering Miranda warnings a nullity is at its 'lowest ebb,' " because the deputies in this case did not deliberately use the "question first" technique like the police in Siebert . The state argues that this case is different because here, the deputies "momentarily forgot, during a rapid sequence of events, to provide defendant with a Miranda warning before asking defendant what was in the bag[ ]" and that they "quickly remedied" their mistake. Moreover, the state argues that (1) the police did not use un-Mirandized statements during the post-Miranda questioning; (2) the two sets of questions did not significantly overlap; (3) defendant expressly stated that he understood the Miranda warnings; (4) the Miranda warnings served as a "break" between the questions; and (5) the police did not coerce defendant during the questioning.
*203 Therefore, the state concludes that the belated Miranda warnings were effective and the trial court did not err in denying defendant's motion to suppress his post-Miranda statements. As explained below, we disagree with the state and conclude that this case was one in which the two phases of questioning blended into the type of "continuum" we have prohibited since adopting the Seibert analysis.
The parties are correct regarding the first Siebert factor, in that the first "round of interrogation" was very short. Indeed, it included only one question: "What is in the bag?" The second "round" was significantly broader and lasted much longer. However, after considering all of the remaining factors and relevant circumstances, we conclude that the warned questioning here did not present "a markedly different experience" from the unwarned questioning. Thus, this case falls on the Seibert side of the spectrum.
First, the setting of the first and second rounds of investigation were exactly the same, and there was no break in time between the two. When Pitcher first asked defendant what was in the bag, defendant was being handcuffed outside of his car. Immediately following defendant's answer of *241 "pills," Reavis Mirandized defendant, asked him if he understood his rights, and then asked precisely the same question. Defendant remained in handcuffs next to his car, having just been threatened at taser point if he did not cooperate consistently with the officers' requests. No break in time occurred at all aside from the time that it took for Reavis to give the Miranda warnings. Although the state argues that the warnings provided a "break," precedent suggests that a break shorter than a few minutes is likely insufficient. We have never suggested that the warnings alone constitute a sufficient break. A break serves to give defendants "an objective indication that the situation ha[s] changed and [is] governed by new rules." Vondehn , 348 Or. at 485, 236 P.3d 691. That break is necessary to dispel what the officers' inherent authority and violation of the defendant's rights may have communicated to the defendant: that he has no real choice to remain silent. See Vondehn , 348 Or. at 481, 236 P.3d 691. Here, merely giving the Miranda warnings was insufficient to objectively indicate to defendant that anything had changed, or that defendant no longer needed to cooperate *204 with the deputies' requests. Moreover, the deputies treated the situation as a continuation of the earlier interrogation. The earlier interrogation ended with defendant's admission that, at a minimum, he knew what was inside the bag. The second round of questions continued to probe defendant to tell the officers what, exactly, it was.
Second, the same deputies conducted both rounds of questioning, and there is no evidence that either cautioned defendant that his earlier unwarned statement could not be used against him. While it is not always necessary to caution defendants about their earlier unwarned statements, id. at 486, 236 P.3d 691, in this case, the deputies' failure to do so undercut the warnings that they actually gave. When Reavis gave the Miranda warnings, a rapid sequence of events had just occurred. Reavis pulled defendant over for a pretextual traffic violation, then almost immediately ordered defendant out of his vehicle and threatened him with a taser if he did not cooperate. Defendant initially refused to answer the deputies' questions about what was in the bag, but he eventually gave a one-word answer. Although Reavis then told defendant that he could refuse to answer questions, objectively, his earlier behavior had indicated that defendant could not refuse to cooperate with the deputies' requests. From the pretext stop to the persistent questioning about what was in the bag in defendant's car, Reavis and Pitcher conducted a "continuous and fluid" police operation. Heise-Fay , 274 Or. App. at 212, 360 P.3d 615. Their pre-Miranda behavior gave an objective indication that defendant would not be permitted to remain silent. Had the deputies explicitly corrected themselves and explained to defendant the inadmissibility of his earlier statement, perhaps the Miranda warnings would have been effective. Given the fact that the same officers conducted both sets of questions as well as the persistency of their line of questioning before and after the Miranda warnings, however, the lack of such a cautionary statement undercut the belated warnings.
Third, while putting defendant in handcuffs may not have added the coercion (to already "compelling circumstances") necessary to render any warning given ineffective, see Bielskies , 241 Or. App. at 25, 249 P.3d 144, the fact that Reavis had, just moments earlier, ordered defendant to cooperate at *205 taser point was "additional coercion." The deputies may have "momentarily" forgotten to provide defendant with Miranda warnings during the "rapid sequence of events." However, our analysis does not take into account what the deputies subjectively believed or thought. Vondehn , 348 Or. at 483, 236 P.3d 691. At the moment Reavis asked defendant the unwarned question, he was still subject to the coercive effect of being ordered out of his vehicle at taser point.
The warnings the deputies gave to defendant did not remedy their mistake. Instead of taking a break or altering the coercive atmosphere in some way to communicate to defendant that the situation had changed, the deputies quickly Mirandized defendant and immediately continued their line of questioning. Because there was no change in circumstances-in the form of a new, less coercive setting or in the form of a few minutes free from additional questioning-we conclude *242 that this case falls on the Seibert end of the spectrum. Because the deputies questioned defendant without giving him Miranda warnings first, they were required to present defendant with an opportunity to make a genuine and informed choice of whether to subsequently waive his Article I, section 12, rights. Jarnagin , 351 Or. at 722, 277 P.3d 535. Particularly in light of the facts that there was no break in time, that defendant remained in the coercive circumstance of being ordered out of his vehicle at taser point, and that the same deputies continued to ask defendant questions along the same line of their unwarned inquiry, we conclude that the belated warnings Reavis gave did not provide defendant with such an opportunity. Thus, the belated warnings were not effective at informing defendant of his Article I, section 12, rights, and therefore, the trial court erred in denying defendant's motion to suppress his pre- and post-Miranda statements. That error was not harmless for defendant's conviction for delivery of methamphetamine. We accordingly reverse that conviction, but otherwise affirm.
Conviction for delivery of methamphetamine reversed and remanded; remanded for resentencing; otherwise affirmed.

On appeal, defendant challenges only the trial court's denial of his motion to suppress his post-Miranda statements. As to defendant's pre-Miranda statement, the trial court did not explicitly rule that it was inadmissible, but at the hearing on defendant's motion to suppress, the state conceded that defendant was in compelling circumstances when he made that unwarned statement. Defendant's brief appears to request reversal of both convictions-on possession and delivery-but he does not argue that the court erred in admitting physical evidence. The state argues that any error in admitting defendant's post-Miranda statements was harmless on the possession count. We agree with the state, and thus affirm defendant's conviction for possession of methamphetamine.

Article I, section 12, provides, in relevant part, that, "No person shall * * * be compelled in any criminal prosecution to testify against himself."